ESTHER J. TOBIAS, ADMINISTRATRIX, ETC., v. THE
MICHIGAN CENTRAL RAILROAD COMPANY.

*Railroad companies—Accident at crossing—Proximate cause—Con-
tributory negligence—Instructions to jury.*

1. The duty imposed upon a railroad company by How. Stat. §
3323, subd. 5 (as amended by Act No. 90, Laws of 1891), to
restore streets crossed by its tracks to their former state, as
near as may be, and to construct suitable road and street cross-
ings for the passage of teams, existed, in the absence of the
statute, under the common law.

2. Where, in a personal injury case against a railroad company,
it appears that the decedent, who was struck by a train and
killed while attempting to drive over the defendant's tracks
at a city street crossing, deliberately drove upon the crossing,
either because he did not see or hear the train, or, seeing it,
attempted to cross ahead of it and miscalculated its speed, it
is not error to instruct the jury that the fact that the street
may not have been restored to its original condition as near
as might be has no bearing in the case.

3. The whole evidence pointed to the fact that one approaching
could see the train, with the headlight burning, for more
than 1,300 feet before it would reach the crossing. And it is
held that it is evident that the deceased, if he had looked,
might have seen the train in time to avoid the accident, and
the fact that he drove upon the track is conclusive evidence
that he did not so look.[1]

---

[1] As to the duty of looking and listening, or stopping and
listening, before crossing or attempting to cross a railroad track,
see *Jensen v. Railroad Co.*, 102 Mich. 176, 181, and note; *McGee
v. Railway Co.*, Id. 107, where the rule is held equally applicable
to an electric street railway; and *Dawe v. Railroad Co.*, Id. 307,
where the plaintiff's intestate is held to have been guilty of such
negligence, in walking a distance of 48 feet after passing an open
railroad gate at a city street crossing, and before reaching the
track, where she was struck by a passenger train, during which
time she could have seen the train for a distance of 425 feet if
she had looked in the direction from which it was coming, as to
bar a recovery, unless it should be held that the fact that the
gate was not let down excused her from exercising care in cross-
ing the track.

4. The defendant, for a considerable time before the accident, had maintained an electric bell at the crossing to give warning of the approach of its trains. And it is held that the court erred in not instructing the jury, as requested by the plaintiff, that if they found that the deceased, who had been in the habit of crossing the track at said crossing, knew of this signal, and that on the night of the accident the bell did not sound its usual alarm on the approach of the train, and that the deceased did not at that time know of any fault in the condition of the bell, such facts might be considered by them, together with all the other facts in the case, as bearing upon the question of whether or not the deceased was free from contributory negligence.

Error to Ingham. (Person, J.) Argued November 21, 1894. Decided December 22, 1894.

Negligence case. Plaintiff brings error.. Reversed. The facts are stated in the majority opinion.

*Black & Dodge* and *Q. A. Smith,* for appellant.

*M. V. & R. A. Montgomery,* for defendant.

LONG, J. In October, 1891, the husband of the administratrix, while driving his horses and wagon on a public highway where it crosses the defendant's tracks, was struck by one of defendant's passenger trains and killed. The accident occurred at 5:30 o'clock in the evening at the place known as "Mt. Hope Crossing," in the south boundary of the city of Lansing. This action is for damages.

The negligence alleged is:

1. Running the train at a high rate of speed, the crossing being a dangerous one, and the night dark and foggy.
2. Failing to ring the bell as required by the statute.
3. That the defendant had, in the construction of its road across this street, excavated the ground, which was originally level, to a depth of from 4 to 6 feet, leaving banks about five feet high on each side of its track at the crossing, and had not restored the street at such crossing

to its former condition as nearly as it might have done, but left it, where it crossed said railroad track, and for quite a distance west, cut down to a level with the railroad track, and that said cut was only about 20 feet wide, which rendered it difficult for a person with a team to turn around therein, and that it had not maintained a suitable and sufficient approach and crossing over such track, as required by law, which acts and omissions on the part of said company were, among other things, direct and moving causes of the accident.

4. That there were obstructions on the north side of this street, west of the railroad track, which interfered with the view of an approaching train from the north, to persons passing east on this street over such railroad track, for a distance of 3 or 4 rods west of the defendant's right of way, which rendered it dangerous, and that the company had for a year or more maintained at such crossing an electric bell to warn those crossing its track of the approach of its trains; that the bell had usually sounded when the train was within 80 rods of said crossing, either way, so that it could be readily heard 40 rods from the crossing, which fact was well known to the deceased; that the bell did not ring upon the approach of the train that killed the deceased; that the company had negligently allowed the same to get out of repair, and consequently such negligence was one of the immediate causes of the accident.

There was evidence tending to show that the train was running at the rate of 25 miles an hour and upwards at the time of the accident, and that no bell was sounded upon approaching the crossing. There was also evidence tending to show that the cut was about 5 feet deep, and 21 feet wide at the bottom, extending westward quite a distance, and also that there was a clump of bushes north of the highway and west of the railroad track, which to some extent interfered with the view of trains coming from the north, to a person passing along the highway towards the east; also that an electric bell had for a year and more been maintained, to warn people of the approach of trains, and that such bell, when in proper condition, could

be heard for 40 rods distant, when a train was within 80 rods of the crossing; that the deceased lived near this crossing, and was accustomed to pass there frequently; that upon the night in question the deceased was last seen approaching this crossing from the west, driving a span of horses attached to a lumber wagon in which he was riding. Defendant's engineer testified that he had his head out of the window, looking right ahead; that he had not seen anything until he saw something that looked like a black cloud, and after that there was a crash, and he put on his air brakes and stopped. He says the headlight was shining, but did not shine on the object before it was struck. He also says, as do others, that the whistle was sounded. On cross-examination the witness further testified that—

"We run with our train under full control 400 feet before approaching a crossing. * * * It was a dark night. It may have been a little smoky. I don't think it was forest fires; something more of a fog,—a little mist. It would make it difficult for a man to walk in the country. Might make it a little difficult for him to see."

Some contention arose on the trial as to the exact position of this clump of bushes, and just how much it obstructed the view of the railroad track to the north, of one passing along the highway going east; and defendant also contended that the banks where the cut was made were not high enough to obstruct the view, in the least, of one riding in the Tobias wagon. It was conclusively shown that the embankments were no obstruction to the view of an approaching train. Upon this point, and the obstruction by the bushes, plaintiff's witnesses, on cross-examination, testified substantially as follows: Witness McKin says:

"I examined the crossing with particular reference to see whether or not one could see an approaching train from the time they got within the lines of the company's

right of way. I think it would be impossible for a man to look down the line without seeing an approaching train from a point 26 rods west of the railroad track. You can see an approaching train all the way, except where the fence and bank and trees interfere, but after getting on the company's right of way you can see an approaching train down to the signal post. At any point between 26 rods west of the railroad and the track, a man looking north could see a train anywhere from 20 to 30 rods north, except where the clump obscures the vision. After a person gets on the right of way, riding in a wagon, it is impossible for him to look north without seeing an approaching train. If he looked, he might see it. He could not help but see it. I mean at any point on the right of way; that is, at any point 35 feet west of the west track. I can see a foot or two before I get on the right of way. The clump of trees grows close to the railroad fence on the west side."

Witness Kitson says:

" The trees and bushes are not on the embankment at that place. They are more or less all along as far down as you can see. They would commence to obstruct the view of an approaching train five or six rods west of the track, and continue to obstruct the view until you get on the right of way."

Witness Hurd was asked:

"How far west—how wide a space—would that clump of bushes obstruct the view of an approaching train?

" A. It might be some seven or eight rods from the track, as you go east, before you struck the track. You might see it plain there five or six rods away. You can see a part of a train, but you cannot see the whole train."

Defendant's witness Harris says he made a correct drawing from the measurement of the track, crossing, and surroundings; that the west line of the company's right of way was 35 feet west of the west rail; that the clump of bushes mentioned was north of the highway fence; that to a person standing at a point 35 feet west of the west rail in the highway, looking north at the semaphore, the range of vision would be 10 feet east of the clump of

bushes; that the semaphore is 1,347 feet north of the crossing; that a person standing in the highway 70 feet west of the west rail, looking north,—the range of vision being immediately east of the clump of bushes,—could see a point north on the railroad from the crossing 230 feet; that, to one back 105 feet, the bushes would obscure a very small space, and when down 70 feet they would obstruct but a very small space; that one could see a portion of an approaching train all the time.

This is substantially all the testimony on that point.

At the close of the testimony, defendant asked the court to direct the verdict in its favor, which was refused. Plaintiff then asked the court to instruct the jury:

" 1. If you find that the defendant company neglected to give the warning of the approach of the train at the crossing required by law, viz., by ringing the bell, that would constitute negligence on the part of the defendant, and the plaintiff would be entitled to recover, unless you should find that the deceased was guilty of contributory negligence in attempting to cross the track."

" 6. The question as to the speed of the train, and the time that it would take to reach the crossing from where it first came into view, and the time that the deceased would take to reach the track after he came into a position in which the view of the train was cut off, and the manner in which he would have been liable to have approached such a track, are all questions of fact for your consideration, in reaching the conclusion as to whether deceased was guilty of contributory negligence or not."

" 9. Under all the evidence in this case, it is only a question of fact for the jury to determine whether or not the deceased exercised reasonable care in avoiding the danger, and whether the deceased, in approaching the train, was negligent; and you have the right to consider all the testimony in relation to the condition of the crossing, the obstructions, the speed of the train, and such other facts, as shown by the evidence, as will throw light upon the question. And if, after considering these facts, under the instructions already given you, you are satisfied by a preponderance of the proof that the deceased came to his death in consequence of the negligence of the de-

fendant, while he was exercising ordinary care, then your verdict must be for the plaintiff for such damages, under the evidence and instructions of the court, as you believe plaintiff is entitled to recover."

These instructions were all given. The following request of plaintiff was refused:

"It appears that the defendant, for a considerable time before the accident, maintained an electrical bell at this crossing, to give warning of the approach of its trains, and if you find that the deceased, who had been in the habit of crossing this track at this place, knew of this signal, and if you shall find that on the night of the accident this electric bell did not sound its usual alarm on the approach of the train that killed the deceased, and that he did not at that time know of any fault in the condition of the bell, then this fact may be taken into consideration by you, together with all the other facts in the case, as bearing upon the question as to whether or not the deceased was free from contributory negligence."

The court, in its general charge, instructed the jury:

"The plaintiff has charged several things against the railroad company as negligence; yet, under the proofs, I instruct you that there is but one of these things which you can consider in determining whether the defendant was or was not negligent, and that is whether the bell on defendant's engine was or was not rung.   *   *   *   Nor would all of these things,—the failure of the electric bell, the failure to restore the crossing, and the rate of speed,—taken together, under the circumstances of this case, be negligence, so as to fix a liability upon the defendant company, provided the bell upon the engine was constantly ringing while the train was passing over the 40 rods of road next northerly from the crossing."

The court also charged that—

"The failure of the electrical bell to ring was not negligence on the part of the company, because such a bell is liable to get out of order, and people must take notice that it is liable to get out of order, and not place dependence upon it. The company do not guarantee that the bell will ring every time. It was not intended that

the bell should take the place of a man's ordinary caution, but that it should be a help added to such caution."

Upon the question of not restoring the highway, the court said:

"The fact that the company had not removed the embankment at the crossing, and had not restored the crossing as nearly as possible to its original character as it existed before the railroad went through, would not of itself be such negligence as would entitle the plaintiff to recover, because the facts of this case do not give that matter enough importance, as connected with the result, to have such effect."

As to the rate of speed at which the train was moving, the court said that "would not of itself make the company responsible." The court also charged:

"If you find that Mr. Tobias looked and listened carefully until he came where he could see up the track east of the trees, all without being made aware in any way that a train was approaching, and you find that the engine bell was not rung, but that if it had been rung he would probably have heard it, and was listening for it; that the absence of its warning had lulled him into a sense of security,—you may take that into consideration in determining whether, acting as a reasonably prudent man, he should have stopped his horses before the collision, because, if the railroad company did not ring its engine bell, it was negligent, and it can gain nothing by its own wrong, but must consent to measure this man's conduct by the situation in which its negligence naturally and necessarily placed him. * * * In the absence of all proof by the way of circumstances and otherwise, it will be presumed that Mr. Tobias looked and listened, and acted as he ought. But if there is a fact or circumstance, or any combination of facts and circumstances, in the case, inconsistent with his looking and listening or his proper action, then there is proof that he did not look or listen properly."

The court also charged the jury at considerable length as to the care which the deceased should have used in approaching the crossing, and that if they found, under

103 MICH.—22.

the circumstances, that he was guilty of contributory negligence, the plaintiff could not recover. The jury returned a verdict in favor of the defendant company.

1. Plaintiff's counsel contend that it was the duty of the defendant company to have restored the highway to its original condition, as nearly as might be; and the argument is made that the object the Legislature had in requiring a railroad company to restore a street crossed by its tracks to its former state, as nearly as may be, was for the safety of the traveling public, and that railroad companies are bound to construct and maintain such crossings so as to make them reasonably safe. There can be no question but that such duty is imposed upon railroad companies under the statute, and, indeed, if the statute had not been passed, the common law would have applied; and the company, in cutting through the highway, would have been bound to construct and maintain the crossing in such condition as to make it reasonably safe. *Maltby v. Railway Co.*, 52 Mich. 108; *Thayer v. Railroad Co.*, 93 Id. 150.

The question whether it was the duty of the defendant company to cut these banks down the full width of the highway, we need not consider here. It is not like the case of *Thayer v. Railroad Co., supra.* There the roadbed was built up to a distance of 20 feet, leaving on the top or crest only a narrow driveway, about 5 feet wide, and on both sides of which were deep ditches. The plaintiff was driving upon this narrow way; and the negligence charged was in maintaining such a narrow way, and in failing to blow the whistle at' the proper place, and in blowing it just as the plaintiff's horse was upon this narrow way, thus frightening him and causing the injury. It was evident in that case that the narrowness of the way was the proximate cause of the injury. In the present case there

is no evidence whatever that the narrowness of the way had anything to do with the injury. The last seen of the deceased alive was when within a few rods of the crossing. The engineer saw the team just before it was struck. It is not claimed that the deceased was attempting to turn around, and could not, by reason of the narrow way; but the evidence all points to the fact that he deliberately drove upon the crossing, either because he did not see or hear the train, or, seeing it, attempted to cross ahead of it, and miscalculated its speed. We think the court was not in error in charging the jury that, though the highway may not have been restored to its original condition as nearly as might be, such fact had no bearing in the case.

2. It is next contended that the court was in error in charging that the rate of speed at which the train was moving would not of itself make the company responsible. It was shown that this highway was nearly as much traveled as any in the city of Lansing, which was shown to have a population of some 17,000. We think, however, that the court was correct in the instruction given. This was a regular passenger train, running on schedule time. No ordinance was shown or claimed, limiting the rate of speed of trains in the city. There is no general statute limiting the speed, and it is well known that trains are often driven at the rate of 40 or 50 miles an hour across country highways. The statute requires certain signals to be given on approaching such highways, and a failure to give them is held to be such negligence as to make the company liable. But the running of this train at the rate claimed, under the circumstances shown by this record, cannot of itself be said to be negligence.

In *Stern v. Railroad Co.*, 76 Mich. 597, it was said that 30 miles an hour was not an unusual rate of speed for a

passenger train past stations; and in *Hagan v. Railroad Co.,* 86 Mich. 615, 624, it was said:

"It must be conceded that in operating a railroad it becomes necessary, at times, to make time between given points, and the running of a freight train at the rate of 40 miles an hour for this purpose is not in itself negligence."

In *Thayer v. Railroad Co.,* 93 Mich. 150, it was said:

"The averment as to the rate of speed of the train is not that the train was running at an unusual rate of speed, but that it was being run at a speed of 40 miles an hour, in a negligent and careless manner. While it is not necessarily negligent to run a train at the usual rate, or at 40 miles an hour, it is negligent to maintain the usual rate of speed without observing the usual precautions and danger signals to warn the public of its approach."

But plaintiff's counsel contend that *Klanowski v. Railway Co.,* 57 Mich. 525, and *Guggenheim v. Railway Co.,* 66 Id. 150, support the doctrine for which they contend. In the first-named case, what was said by Mr. Justice SHERWOOD about the running of the train at a great rate of speed, and that whether or not proper care was made to appear in this particular, was a question of fact for the jury, was not concurred in by the remainder of the Court. Mr. Justice CAMPBELL expressly dissented from this doctrine, in which dissension Chief Justice COOLEY concurred, and Mr. Justice CHAMPLIN concurred only in the result arrived at in the general discussion of the case. In *Guggenheim v. Railway Co.,* it appeared that the street was a public one in the city of Hillsdale, and at the crossing the view was obstructed by buildings coming up within a very few feet of the tracks. It was said:

"While there was at the time of the accident no statute limiting the speed of the train over this crossing, yet the speed of such train must nevertheless be consistent with the degree of care and prudence required in good railroad

management; and such crossing must be approached and passed over with the care and prudence commensurate with the rate of speed attained, and the train managed and controlled with that degree of care and prudence required for the safety of the lives and property of the persons rightfully approaching and traveling over such crossing."

No case within this State has gone to the extent of holding that the running of passenger trains at 25 miles per hour is of itself negligence. It is true that such facts might exist as to make the running at that rate of speed dangerous and reckless, but such facts do not exist here. There was no obstruction to the view of the train by the embankment, and none by this clump of bushes, except at quite a distance back from the crossing; and even there only a part of the train was obstructed from view, and only for a moment. The whole evidence points to the fact that one approaching could see this train, with the headlight burning, for over 1,300 feet before reaching the crossing.

With these facts appearing plainly upon this record, it is evident that the deceased, if he had looked, might have seen the train in time to avoid the accident, and the fact that he drove upon the track would be conclusive evidence that he did not look; and the court should have directed the verdict in favor of the defendant, but for the question of the maintenance of an electric bell there. The court was expressly asked to charge upon this point, by the plaintiff's third request, that, if the deceased did not know of any fault in the condition of the bell, this fact might be taken into consideration, with other facts in the case, as bearing upon the question of deceased's contributory negligence. This request should have been given. It cannot be said that the deceased would have no right to rely upon the ringing of this electric bell to warn him of the approach of the train. If the electric bell had rung, it would have given him warning. That he expected it to ring might make him less cautious in looking for the

coming of a train. The case is somewhat similar in principle to *Richmond v. Railway Co.*, 87 Mich. 374. In that case it was said substantially that it was almost absolutely certain, from plaintiff's own showing, that he did not look south when within 20 feet of the tracks, and that whether he was negligent depended in a great measure upon whether or not he had a right to rely, under the circumstances, upon the absence of the flagman, and the lack of any signal of danger from him. The cases upon that question are collected, and upon the whole case it was held that the circumstances were such that it became a question for the jury whether the plaintiff was guilty of contributory negligence. So we think in this case that, under proper instructions from the court, that question should go to the jury, in connection with plaintiff's third request, which should have been given.

The main questions raised by briefs of counsel have been fully discussed, so that upon a new trial the rights of the parties may be fairly submitted.

The judgment must be reversed, and a new trial ordered.

McGRATH, C. J., MONTGOMERY and HOOKER, JJ., concurred with LONG, J.

GRANT, J. I concur in the opinion of my Brother LONG, except in what he says about the failure to ring the electric bell stationed at the crossing. This bell is not required by the statute, and the failure to ring it is not negligence *per se*. There was evidence that the apparatus by which it is rung was out of order. Several of the witnesses, however, for the plaintiff, testified that it did ring, but not so loud as usual. The fact that it did not ring at all, or as loud as usual, could not, in my judgment, operate as an excuse for Mr. Tobias. He was bound to use his senses of hearing and seeing to the same degree as though the bell had not been there. The highway was on

the outskirts of the city. Mr. Tobias lived near the cross-ing, and was familiar with the danger. He knew that trains were liable to pass at any time, and is chargeable with knowledge that this was the time for the approach of a regular passenger train. To hold that such an apparatus, not required either by the statute or by the common law, but placed by the company in a laudable desire to furnish every notice possible of an approaching train, may operate to excuse a traveler from looking and listening for an approaching train, is a doctrine which I do not think is sanctioned by reason or authority. Every traveler knows that a train cannot stop instantly, and that if he drives his team upon the track he endangers, not only his own person and property, but the lives and property of the employés and passengers upon the train, and, as well, the property of the company. If it was so dark or foggy or misty that he could not see the light of the approaching train, it was clearly his duty to stop and listen. Had he done so, the conclusion is irresistible that he would have heard the noise of the train. It is a matter of common knowledge that electrical bells are liable to be out of order. In order to excuse the failure of Mr. Tobias to look, or to stop and listen, if he could not see, the jury would be compelled to find that he had the right to rely upon the ringing of the electrical bell as notice of the approaching train, and to drive on without other precaution. I think the request was properly refused.

I think the court should have directed a verdict for the defendant, but he left the case to the jury with very careful instructions on both the negligence of the defendant and the negligence of the deceased, instructing them to consider all the facts and circumstances in the case bearing upon both. The jury found a verdict for the defendant.

The judgment should be affirmed.