HARDY *v.* PERE MARQUETTE RAILWAY CO.

RAILROADS—NEGLIGENCE—CONTRIBUTORY NEGLIGENCE—CROSSING AC-
CIDENT.

> In an action against a railroad company for damages to plaintiff's auto truck, received in collision with defendant's engine upon a highway crossing, where the evidence shows that plaintiff with his chauffeur drove at the regular rate of speed upon the crossing, which was known by them to be a dangerous one, without stopping to look and listen, he was guilty of contributory negligence, barring recovery.

Error to Bay; Houghton (Samuel G.), J. Submitted October 23, 1919. (Docket No. 49.) Decided January 5, 1920.

Case by Herman A. Hardy against the Pere Marquette Railway Company for damages to an automobile truck by collision. Judgment for plaintiff. Defendant brings error. Reversed, and no new trial ordered.

The question of duty of driver of automobile as to stopping, looking and listening before attempting to cross railroad track, see note in 46 L. R. A. (N. S.) 702.

*Shields, Merriam & Sleeper* and *William R. Seaton*
(*James E. Duffy* and *Russell H. Neilson,* of counsel),
for appellant.

*Collins, Thompson, Otto & McGinnis* (*Charles W.
Hitchcock,* of counsel), for appellee.

STEERE, J.   Plaintiff recovered a verdict and judgment in the circuit court of Bay county in the sum
of $1,000, for damages done his automobile truck on
August 16, 1917, in a collision between it and a freight
train of defendant's at a place called Gilman's crossing, located between the villages of Farwell and Clare
in Grant township, Clare county.

Plaintiff is a piano and music dealer of Bay City
and was accustomed to make weekly business trips by
automobile through different sections of neighboring
counties.   On the occasion in question he was on his
way from the village of Farwell to the village of
Clare, a distance of about 6 miles, going southeasterly
along the main traveled highway between the two
places which crossed defendant's railroad track about
1½ miles southeast of Farwell.   He was accompanied
by a piano tuner named Hobby who was driving the
auto truck.   Plaintiff was familiar with the road, having known it for 15 years and traveled it many times.
Hobby had driven over it in the opposite direction
the previous day.   The general direction of the highway between the two places is northwesterly and
southeasterly, approaching the railroad track from the
northwest at an angle of about 45 degrees.   It is called
a sandy road for most of the distance from Farwell
to the railroad crossing and that section of the country
is described by plaintiff as quite hilly.

Some 30 or 40 rods to the northwest of the crossing
is a small hill over which the highway passes.   From
this the railroad is visible both at the crossing and for
a considerable distance in each direction.   The high-

way slopes down the hill for some 20 rods or more to a small bridge over the Tobacco river and from the bridge slopes upward for some 8 to 10 rods to the railroad crossing which is estimated by plaintiff as 3 feet and by Hobby as 6 or 7 feet higher than the bridge. They both testified that as they approached the crossing they listened and looked in both directions for a train, but discovered none, and as they neared the crossing Hobby fed more gasoline into the car and put his foot on the accelerator to carry them up the grade and over the crossing. The automobile is described by plaintiff as a Dodge touring car made into a truck for the piano business, that it was a "fairly high power car" with three speeds—high, medium and low—"usually driven in the high gear," and of the others said, "second gear is when you get into a pretty tough place, to get through you will throw into second, it gives you more power in second than in high, and if you have a still harder road to travel you put it into low; when you get your engine almost exhausted on high we switch it into second, that gives us more power to shoot through." They had no piano or other load in the truck except themselves, plaintiff's grip, some piano player rolls and their appliances for moving pianos, which "stuff" plaintiff says "was just loose in the back part" of the van, and he had no difficulty that day in getting up the grade from the bridge to the crossing on high gear. He described their approach to it as follows:

"From the top of the hill we didn't stop any place until we got hit. We didn't change the gears at all, did not go from high into intermediate or low. This sand did impede our speed on high gear, but we could still keep going on high gear through the sand. We didn't have to shift into intermediate on account of the sand as you approached the railroad track. When we got to the railroad track we were going 8 or 10 miles an hour. The bell did not ring, being so close

to us, or we would have heard it, I didn't hear the bell and didn't hear any whistle. I would not say that the bell did not ring or the whistle did not blow. I was listening for the bell and didn't hear it. I was listening for the whistle and didn't hear it, that is the reason I say the whistle did not blow or the bell did not ring."

A witness named Mrs. Clare McGinnis did say the whistle was blown for the crossing and she heard it. She testified to seeing them approaching the crossing in their automobile apparently paying no attention and that she screamed to warn them. Her home was upon this road on the right hand side some distance north of the crossing. At that time she had followed and was attempting to catch a horse which had gotten out of their pasture, intending to put him back in again, and was but 8 or 10 rods from the crossing. She had just caught the horse when she heard the train approaching and the whistle blew for the crossing, which caused the horse to jump and jerk away from her, hurting her arm. She then turned around to watch the train and saw the automobile passing down the road from the north towards the crossing. She testified the "train tooted before these men got to the bridge" and while she was yet closer to the crossing than they were she saw the man on the right hand bend down and pass a bottle up to the man who was driving, who raised it to his mouth, and when they got near the track she screamed and then turned towards home not wishing to see the accident. Of what she observed she testified:

"It frightened me; these men were not paying any attention to the train, I thought they didn't know there was a railroad track there, that is the reason I screamed, I thought if they heard me scream they would look at the track."

Hardy and Hobby both testified that they did not
208—Mich.—40.

see or hear the woman, that they had nothing to drink
with them; that there was no occurrence with a bottle
such as she describes, that they had nothing to drink
with them and neither of them drank. A peculiar inci-
dent in that connection which is not disputed is the fact
that after the collision 3 bottles of beer were found
scattered around in that vicinity which certain of the
parties secured and had a drink from. Not denying
that the bottles were found there at that time, both
the parties in the automobile and the train crew posi-
tively deny that they had any beer with them on this
occasion.

Just as the automobile went upon the crossing, and
before it could clear the track going at the speed de-
scribed, a freight train of 22 cars coming from the
east struck and demolished the truck. Plaintiff and
Hobby sprang clear of the collision just in time to
save themselves, and two brakemen who were riding
on the pilot beam in front of the engine also leaped
in time, though one of them was injured by striking
the cattle-guard fence. The accident occurred on a
bright, clear day between 3 and 3:30 o'clock in the
afternoon. The only grounds of negligence charged
by plaintiff against defendant were failure to ring
the bell and sound the whistle on approaching the
crossing.

At the conclusion of plaintiff's testimony defend-
ant's counsel moved the court for a directed verdict,
urging amongst other grounds failure to show any
negligence of defendant and particularly that the
plaintiff's testimony showed the accident was attribu-
table to his own negligence, and that of his driver
which was imputable to him. This contention was
presented at the close of all the testimony by motion
and requests to charge, followed by motion for judg-
ment notwithstanding the verdict, and motion for a
new trial in which this claim was urged with various

others, including the claim that the verdict was against the great weight of evidence.

The only testimony that the statutory crossing signals of the coming train were not given is that of plaintiff and Hobby, who approached the crossing in this auto truck with a quantity of "stuff" thrown loose in the van behind them, running down the hill, across the bridge and up the slope on high speed to the crossing at the rate of 8 or 10 miles an hour, "not to exceed ten miles" as Hobby stated it, without stopping or slowing down to listen. They said the truck made no noise to interfere with their hearing other sounds, and gave negative testimony that they heard no whistle, bell or approaching train, which they fortify by the assertion they would have heard the whistle and bell had they been sounded, although they did not hear the noise of the approaching freight train of 22 cars running over 20 miles an hour until it was upon them. Against their negative testimony was the positive affirmative testimony of several witnesses to the fact that the whistle and bell were sounded. Plaintiff and Hobby both admitted they knew they were coming to a dangerous railroad crossing. Upon the west of the highway, as they describe the situation, they had an unobstructed view of the railroad track for a safe distance, the only danger being from the east by reason of a bank, shrubbery and trees which entirely obstructed their view of the track in that direction, so that it would have availed nothin to stop and look for a train from the east at any safe distance from the track. Conceding the sincerity of their testimony, it is based upon what observations they made as they rode along in their covered truck at 8 or 10 miles an hour and they are the only witnesses who so testify. Apparently disinterested witnesses, who had lived long in that vicinity and traveled this road often, flatly testify to the contrary, with

description of various points within four rods north of the track where an unobstructed view of an approaching train from the east can be had for various distances up to over 800 feet. These witnesses corroborated in substance the testimony of defendant's employees who were familiar with the locality, and the tests and measurements they made.

A careful study of the record is persuasive that the great weight of convincing evidence is to the contrary of plaintiff's claim that the crossing signals were not given and that in approaching defendant's track from the north after descending the small hill there was a continuous obstruction of the view to the east until the crossing was reached, but aside from other questions raised in this record the undisputed evidence of plaintiff's contributory negligence is conclusive against recovery.

It is conceded that plaintiff, with Hobby as his chauffeur, drove his auto truck to and upon the crossing at the regular rate of speed they were maintaining on their journey, without halting at what they say they knew to be a dangerous railroad crossing or complying with that saving duty under such conditions to stop, and having stopped to look and listen. His excuse is that they did listen as they drove along and the obstruction to their view to the east relieved them from the duty to stop. Whether it did or not was left to the jury as a question of fact.

In support of the contention that plaintiff's evidence raised an issue for the jury upon that proposition, it is pointed out that it shows the road as they approached the crossing was sandy and rutted, with a rise, or "bump," where the wheel track in the highway went upon the planks of the crossing, and the following testimony of plaintiff is emphasized:

"*Q.* In approaching this railroad you may state whether or not if the car had been stopped just be-

fore you got to the track could you have seen from the automobile an approaching train?

"*A.* We could not without we had driven right up to the track.

"*Q.* From the condition of the road and the rise there, was there to get over the tracks with your automobile, if your automobile had been stopped at that point, what would you have to do to get over the track?

"*A.* Well, I think we would have to back down and take a run at it again."

This excerpt and some other assertions by plaintiff of similar import are largely negatived by his own testimony and that of Hobby, who was driving, and makes no claim that they could not have stopped and started again within the right of way, which he testified extended north from the track "two or two and a half rods, something around 41 or 42 feet." The railroad right of way was shown without question to be 100 feet wide at this crossing and free from trees and brush. During his examination plaintiff also testified upon this subject as follows:

"*Q.* You know there is not any evergreen trees near the railroad right of way, don't you?

"*A.* Right up to the right of way.

"*Q.* The evergreen trees are in front of the house to the north of the track about 100 feet away, isn't it?

"*A.* That is inside their yard. * * * The right of way there is about four rods wide. It is fenced on each side, and there are no trees in the right of way. There is none of this brush that I speak of. * * *

"*Q.* How far down the track could you see an engine which is twice the height of your body, ten feet from the track?

"*A.* You couldn't see it until you got up to the track. You couldn't see it ten feet from the track. * * *

"*Q.* Your car would have been going slower if you were running on that (intermediate) would it?

"*A.* No, I don't know as it would—you could run much slower on intermediate, that is true.

"*Q.* You could stop quicker also than running on high?

"*A.* Yes, sir. * * *

"*Q.* Well, that is a pretty well cleared up territory over there, isn't it?·

"*A.* Well, right along in that particular place it is not, no, because it is right there where there is a house.

"*Q.* Well, you understand what I mean by cleared land, it is not wooded land, is it?

"*A.* No, it is not wooded land. * * *

"*Q.* There is no shrubbery or small timber on the railroad right of way?

"*A.* Well, no. * * *

"*Q.* If you had stopped five, ten or fifteen feet with your machine that day, stating as you did that the train was within 20 feet of you when you got to the crossing, that accident could have been avoided?

"*A.* Yes, of course, if we had."

Hobby testified in part as follows:

"From the bridge going towards the railroad track we maintained a speed not to exceed ten miles an hour, I could run that truck on high at ten miles an hour going through the sand; if the sand became such as to slow our machine down I would have made the next move which would be to put the machine into intermediate and putting it into intermediate makes it go slower, but more powerful. * * * I knew the railroad track was just where it was, and I got ready to go over the railroad track from the bridge, that is about eight or ten rods, something like that, 120 to 130 or 140 feet back; from that point I knew the railroad crossing was there, and I took whatever steps I did take either by accelerating my car or in the handling of it to bring myself over that railroad track. * * * The north fence, the trees and house and all of that were still north of the railroad fence; the Stoyke house on your left as you approach the railroad track southerly on the highway was north of the railroad fence about 30 or 35 feet, something like that as near as I could guess, * * *

"*Q.* Well, you could (see) for 30 feet at least north of the north railroad fence, couldn't you, because that is where they are, you say?

"*A.* Well, sir, I couldn't tell you whether you could

see 30 or 20 feet. * * * I didn't stop the car 5, 10 or 15 feet back of the crossing, because I heard no warning of any trouble. I knew it was a dangerous crossing. *' * * I didn't stop my car then to find out whether anything was coming, because there was no warning or noise of any kind to signal I should stop. That is the only reason I can give. * * * I had complete command of the automobile when I struck into this rut; it did not throw me on the track; my engine was going when I was on the track; I was making an effort to get over then; the same effort I was making getting up the hill, nothing extra. I didn't do anything after I saw the train but to make a getaway. * * * I presume I was 10 foot from the railroad track when I first saw the engine; my front wheels were right there close. In figuring ten feet I figure the distance from the front end of the car."

His reason for not stopping near the track within the right of way was not any fear of getting stalled, but because he heard no noise or warning to signal he should stop as he rode along. He had complete command of his automobile and was running on high gear with intermediate and low in reserve, to give "more power to shoot through" with if his engine became "almost exhausted on high," of which there was no indication. Under the facts shown by plaintiff's evidence the following language in the early case of *Lake Shore, etc., R. Co.* v. *Miller,* 25 Mich. 274, where the subject is exhaustively discussed by Chief Justice CHRISTIANCY, is well in point here:

"That such failure, under such circumstances, to make use of any means to ascertain whether a train is approaching, before venturing upon the track, must of itself be pronounced negligence, as matter of law, is a proposition as sound in principle as it is well supported by authority."

The rule of reasonable precaution declared in that case has since been many times reiterated and applied to pedestrians, animal-drawn and motor vehicles. We

need not repeat what has so recently been said as to the duty of drivers of motor vehicles when approaching railroad crossings to recognize the danger—stop, look and listen—and make use of any available means to assure themselves no train is approaching before attempting to cross. Plaintiff could have done this, but did not take the trouble to do so. In *Shufelt* v. *Railroad Co.*, 96 Mich. 327, where the question of obstructed view was involved, this court said:

"These trains must run where the view is obstructed by cuts, by embankments, by trees, and other things. He who does not choose to stop and listen, where he cannot see, must suffer the consequences of his own negligence."

We think this case is governed by the rule of a driver's duty as announced in *Sanford* v. *Railway Co.*, 190 Mich. 390; *Miller* v. *Railway*, 200 Mich. 388; *Gillett* v. *Traction Co.*, 205 Mich. 410; *Pershing* v. *Railway Co.*, 206 Mich. 304, and cases there cited. In the *Pershing Case* it is said of an obstructed view:

"It is conceded that Pershing did not stop until he reached the track and it is obvious that he did not look as soon as he could have seen, because if he had, and applied his brake, he could have stopped in a place of safety. * * * If he could have avoided injury by stopping, by listening, or by glancing to the east as soon as the obstructions would permit, and he failed to observe these duties, he did not use the care which an ordinarily prudent man does on such occasions."

The judgment is reversed without a new trial, with costs to defendant.

MOORE, C. J., and BROOKE, FELLOWS, STONE, and SHARPE, JJ., concurred with STEERE, J. BIRD, J., concurred in the result.

Justice KUHN took no part in this decision.