AMEDEO *v.* GRAND RAPIDS & INDIANA RAILWAY CO.

1. RAILROADS—CROSSINGS—DUTY TO STOP, LOOK AND LISTEN—"PRO-
TECTED CROSSINGS"—GENERAL RULE—EXCEPTIONS.

> The general rule that one approaching a railroad track,
> knowing the same to be a place of danger, who does
> not stop, look, and listen, is guilty of contributory neg-
> ligence as a matter of law, in case of injury, is not ap-
> plicable to a "protected crossing," unless the contributory
> negligence is so apparent that all reasonable minds could
> draw but one conclusion from it; in every other case
> it is the duty of the trial judge to submit the question
> to the jury on the evidence, under proper instructions.
> FELLOWS and CLARK, JJ., dissenting.

2. SAME—NEGLIGENCE—CONTRIBUTORY NEGLIGENCE—CROSSING AC-
CIDENT—EVIDENCE—QUESTION FOR JURY.

> In an action against a railroad company for the wrongful
> death of plaintiff's decedent, who was struck at a rail-
> road crossing of a public street by cars being shunted
> down defendant's track without a light or other signal
> of their approach, although it was getting dusk, testimony
> by the flagman, whose duty it was to protect pedestrians
> at the crossing from injury, that decedent was standing
> in the street directly in front of him with his back to
> the cars, close to the track, that they were conversing
> together, decedent having asked him to be directed to
> First street, that when he first saw said cars approaching
> they were 400 or 500 feet away, but that he did not
> warn decedent until they were almost upon him, and
> too late to protect him, *held*, to justify the trial court in
> submitting to the jury the questions of defendant's neg-
> ligence and decedent's contributory negligence. FELLOWS
> and CLARK, JJ., dissenting.

3. SAME—CONTRIBUTORY NEGLIGENCE—USE OF RIGHT OF WAY BY
PEDESTRIAN PREVIOUS TO INJURY ON CROSSING NOT CONTROLLING.

> That decedent came down defendant's right of way to the
> crossing, would not render him guilty of contributory
> negligence as a matter of law, where, at the time of

On duty to stop, look and listen after entering on first track,
see note in 17 L. R. A. (N. S.) 505.

On effect of pedestrian's looking, or failure to look, before
crossing railroad, see note in 13 L. R. A. (N. S.) 1069.

the injury, he was standing in a public street, although too close to the track.

4. SAME—PEDESTRIAN MAY NOT RELY ENTIRELY ON MEANS USED TO PROTECT CROSSING.

That a railroad company protects its crossing by a bell, gate or a watchman or flagman, would not entitle one about to use the crossing to depend for his safety entirely on such means of protection, but he must conduct himself as an ordinarily prudent person would, under all the circumstances shown.

5. EVIDENCE—PHOTOGRAPHS—ADMISSIBILITY.

The admission in evidence of a photograph of deceased, who was 39 years of age, and who was claimed to have been a well and robust man, *held*, not reversible error, since it would have a tendency to show his physical appearance and condition when taken.

Error to Kalamazoo; Weimer (George V.), J. Submitted April 20, 1921. (Docket No. 104.) Decided July 19, 1921. Rehearing denied October 3, 1921.

Case by Paula Amedeo, administratrix of the estate of Leo Amedeo, deceased, against the Grand Rapids & Indiana Railway Company for the negligent killing of plaintiff's decedent. Judgment for plaintiff. Defendant brings error. Affirmed.

*James H. Campbell, Elvert M. Davis,* and *Harry C. Howard,* for appellant.

*Jackson, Fitzgerald & Dalm,* for appellee.

STONE, J. Plaintiff brought this action as administratrix of the estate of her deceased husband, Leo Amedeo, to recover damages for the latter's death by three of defendant's detached cars, while being shunted or switched, striking and instantly killing deceased in the yard of the defendant, at the Third street crossing in the city of Kalamazoo in the early evening of April 6, 1920. The accompanying sketch offered in evidence as Exhibit 1, showing the location of de-

fendant's tracks, and intersecting streets between Grace street on the north, and Vine street on the south, in said city, will aid in understanding the situation. By reason of the failure of appellant's counsel to comply with Rule No. 40, and to make "a clear and concise statement of the facts of the case," our· labors have been much increased. We glean from the record the following statement:

At the Third street crossing there were no gates, but there was a watchman or flagman. The deceased had for some time been in the employ of the city in sewer construction. On the day in question a work train of defendant's had been working north of the city. The train consisted of three gondola cars, all loaded with old rails, a caboose and an engine. The engine was reversed facing the south. When the train reached Kalamazoo it stopped at the station and the laborers got off the train and the caboose was detached. After letting the laborers off, the train continued traveling south. There was a down grade from First to Third street. They there made what is termed a "drop" of the three cars on the first track east of the main track. This was described by the conductor of the train as follows:

"By making a 'drop' of the cars, we started the engine and cars and cut the engine loose from the cars and backed the engine away, and the cars followed, and somebody cut the switch and let them off on the opposite track. We dropped three cars there. In other words, I managed this switch during that 'drop.' The train was sent forward to the south. And the engine was detached from the cars, that is, cut off from the cars, after we stopped, and I walked down and got the switch and we started the cars, started the whole train. * * * After it got started it was uncoupled just north of First street. It was uncoupled between the engine and the first car. The train, the cars, engine and cars were going south. As these cars passed south I threw the switch

after the engine got past the switch point and let the cars go in on No. 2 track. That put the engine on the main track, and that put the cars on the first track east of the main track. * * * Both the engine and the cars were traveling south. The engine traveled south just far enough to let the cars in there on this track. They traveled south to the Third street crossing. They didn't go clear across Third street; they went to it, they went just about half over the street or a little better."

A brakeman by name of Baird was on the cars in between the first and second of these three cars loaded with rails as they passed on the east track. There was no whistle of any kind on those cars. There was nothing to make a noise with in that respect. There was no bell on them. It was not dark enough for lights. They had no lights on.

Witness continuing:

"My intention was to put these cars any place south of First street to clear the main track. I was simply to get them clear of the main track at that switch, at No. 1. They were not to be left there any length of time. I was going to get hold of them right away with the engine, on the north end. We were to run in on the same track again and pull them out with the engine, and we did eventually do that. Instead of finding them just clear of the main track here, south of First street, we found them down here at Third street, something like 450 or 500 feet further south."

The cars were about 36-foot cars, and the conductor estimated that they weighed about 24 tons each, unloaded. The witness stated that they had to stop to "bleed" the cars before they could "drop" them, and he explained:

"By bleed them, I mean get the air out of the cars. You cannot move the cars without the air being cut off from the engine. That was done before we got the cars on the side track."

There were no cars on that track between First and Third streets except the three cars in question. There was a sidewalk on the north side of Third street that comes down to the crossing.

The crossing flagman testified that the little mark on Exhibit 1 represents the location of his flag station, it being just north of the sidewalk as it crosses Third street, the flag station being on the north side of the crossing. This witness testified that Mr. Amedeo was a stranger to him, and he did not remember ever having seen him before the day he was killed at that crossing. The witness testified that his recollection was that the engine that was on the work train was standing on the main track, north of Third street, at the time of the accident. Mr. Amedeo seems to have come down to Third street through the yard from the north. The flagman's testimony is deemed important. He testified as follows:

"When I first saw Mr. Amedeo on the occasion that I am talking about, I was standing, if my memory serves me right, about probably six feet from the sidewalk south of the shanty and about two feet from No. 2 east track. I mean two feet east of the east track. I was in the clear of the east track myself, * * * and I was talking to him. I was looking west across this way as I stood there at that time. I had a lantern in my hand at that time and it was lit. When I first saw Mr. Amedeo, he just stepped up to me, right where I was standing, he was a little to the right of me. It was so near the sidewalk it would be hard to measure the distance. He was standing directly in front of me, a little to my shoulder. I don't think I had ever met him before. I never saw him to know him. He come up to me and asked me to direct him to First street. I understood him to say Fourth street. He said First. I turned around and pointed to the direction he come from. I pointed down to Harris & Pratt's woodyard, and turn up on Sheldon street. That was clear up east of the tracks. I pointed that way around there. He

would have to go that way to get on Sheldon (indicating east). I told him to go that way, it would be a little shorter to go down; I says, 'walk down that way and don't get mixed up in that network of tracks, because they are switching,' *and I seen the cars coming up behind him.* That was after I discovered he didn't want to go to Fourth street. * * * I says, 'go down to this corner and turn to your left and follow the street and you will come on First street.' I said that they were switching, if he went around there. If he went the other way, he would not be mixed up in the track, where they were switching cars. * * * After I got through telling him that, I looked around and see these cars coming, and I says, 'look out for those cars behind you.' He looked around, if my memory serves me right, and just about the time he turned around I stepped back from him and he gave a move, and the car struck him somewhere in the back, and throwed him a little to the east, pushed him. I can't tell just how far away those cars were when I turned around to the right to give him those instructions and I saw those cars. My best judgment is probably four or five feet. * * *

"When I saw them the first time they were just about at First street, a little south of First street. The next time I saw them they were a short distance away; I didn't measure it. I saw the brakeman on those cars. He was on the south end of the second car, standing between the first car going by and the middle car. He was between the cars, standing on the foot-board at the brake. * * * It was not until after the cars passed by and the man had been struck, that I saw the brakeman. There was no lights on those cars. * * * The first knowledge I had of those cars coming across the crossing was when I looked to the right and I saw them four or five feet away after I saw them at First street. I stepped back out of the way because I gave him a chance to come forward. It seemed he didn't succeed in getting out of the way. He was struck by those cars. I would judge it would be the corner of the car that struck Mr. Amedeo. I saw them come together. I saw him after he was coming along and the car

throwed him. I didn't dast chance giving him a holler. I thought he might be able to clear himself without I hollered. I pulled him from under the cars. * * * The top of his head was partly cut off. I expect he was dead. I flag automobiles and pedestrians passing there, when the trains is moving over the crossing. I am provided with a board there with the signal on it 'Stop.' It had big letters on it 'Stop.' I also have a lantern at night. I don't use a red lantern, a white light. And that is what I had with me at that time. I did not have the 'stop' board. I can't tell how long I had been out there before Mr. Amedeo came along, but I had been out there for quite a while, because there was trains passing by, but I don't know just how long. * * * I think it was somewhere between 6 and 7 o'clock, but I can't say which it was, * * * some time along there. I lit my lantern about the time to have it for use when it would become the time. I had it out there with me for use. I was then using the lantern. * * * Just a few minutes before there was a switch engine went south with a string of cars, and the gravel train followed them down. Two trains went south just before this. I can't tell how long before in minutes, but if I remember right, I think the train pulling the gravel was going right by at that time, possibly it might have been three or four cars south of Third street. I had been out to protect the crossing on those trains and I hadn't gone back to the shanty. I was still out there in connection with my services in protecting the crossing on those trains that had gone south. I had used the lantern in protecting the crossing on those trains that had gone south."

This witness had been called by plaintiff under the statute. On cross-examination by defendant's counsel he further testified in answer to the question:

"*Q.* How far up the track, standing where you did, could you see from where you stood there that night; how far north could you see?

"*A.* Standing up between the shanty and the track I can see to First street. There had been an engine passing south through there just a little before he

came up to speak to me. At that time it was not entirely dark, but I was using a lantern. I use the stop sign when it is daylight, and as it gets dusk I change to a lantern. * * * I couldn't tell you whether he came on the track. I didn't see him until he came up beside of me, and I said if he come down the track he would come to First street, and then I directed him the other way. I didn't take any particular notice of whether he was looking at me or not. I was watching the tracks myself. Just then I saw the cars coming and I said 'look out for those cars.' I said that quick to him. I stepped back and I said, 'look out for them cars.' He moved, he kind of just gave a little glance like that, and started to go the other way but they struck him. If he had looked from where he was standing, if he had looked up north on these tracks, he could have been seen as far as I could from where we were standing. That is as far as First street. I had seen these cars start down from First street. He was killed instantly; that is my judgment of it."

It was the claim of the plaintiff that defendant's employees were negligent in the manner in which the three cars were operated—were detached from the engine, and were permitted to cross Third street without any signal or warning of their approach, either from any employee on the cars, or by means of a whistle or bell, or other signal, or any warning from the flagman stationed at the crossing.

Upon the trial, at the close of plaintiff's evidence, the defendant moved for a directed verdict in its favor, for the reason that the plaintiff's decedent, as matter of law, was guilty of contributory negligence, and that the plaintiff had failed to show that the deceased was free from contributory negligence; that the plaintiff's decedent stood there within the danger zone with the crossing watchman; that the evidence showed conclusively that while standing in that zone talking to the watchman he failed to look, and that had he

looked he could have seen the cars coming. The court announced that the motion would be reserved until after the verdict. Thereupon the defendant offered testimony in its own behalf, and the case was submitted to the jury.

There were 11 requests to charge presented by defendant's counsel, all bearing upon the question of contributory negligence. None of them was given in form, although the substance of some of them, we think, was expressed in the general charge of the court. In view of the position taken by the defendant in this court that the question involved is one relating to the contributory negligence of the plaintiff's decedent, we shall content ourselves by quoting from the charge of the court upon that subject, the portion of the charge contained in parentheses being matter upon which error is assigned:

"Now, on the question of contributory negligence: What would or would not constitute contributory negligence I may say this to you: It was the duty of the deceased, and he was required under the law to use that degree of care and caution for his own safety that persons of ordinary prudence would have used in the same or similar circumstances, that is, if confronted by the same or a similar situation. If he was guilty of any want of ordinary care on his part for his own safety, for his own protection, and that want of ordinary care on his part contributed to his injuries, then the plaintiff in this case cannot recover.

"Contributory negligence may be defined as some act or omission by the person injured which an ordinarily prudent person would not have done, or would not have left undone in the same circumstances, which directly aided in causing or contributing to the injury received. The rule of prudence, binding in any competent person in any circumstances must be that which in just such circumstances would restrain the ordinary person of ordinary prudence. If the mind of an ordinarily prudent man would be impressed with a belief of danger, he has no right to incur the danger.

If the danger would not be apparent, he is not negligent in acting on that assumption.

"If the deceased was guilty of any want of ordinary care and caution, however slight, which negligence contributed directly to produce the injury, he cannot recover. Every person is required to use his sense of both sight and hearing for self protection whenever there may be reasonable cause to apprehend danger. He must do all that an ordinarily prudent person ought to do or could be expected to do in any given circumstances. A railroad track in itself is a warning of danger.

."(A person in possession of his senses, before going thereon must look and listen. That applies to country crossings, open, exposed crossings, where there is no gateman. I will explain that to you in a moment. The last part, look and listen at open country crossings where trains may be expected at any time, where there is no flagman or gateman, the rule is a person approaching that crossing must stop, look and listen for his own safety. If he fails to do that, and is injured, he is guilty of contributory negligence. That is not the rule in cities, particularly at crossings at which gatemen or flagmen are maintained, and I will explain that to you in a moment.)

"We have no rule of comparative negligence, so-called, in this State. It is sufficient to bar recovery if the party injured, to some extent by his own negligence, by his own want of ordinary care, contributes to his own injury. The parties being equally at fault, there can be no apportionment of damages. The law has no scale in such a case to determine whose wrong-doing weighed the most in the compound that occasioned the mischief.

"As I have just said to you, it was the duty of the deceased to use his senses of sight and hearing. At railroad crossings where no flagman or gateman or other means of giving notice or warning of the approach of trains are maintained, persons approaching such crossings are required to look both ways, and to listen, and even to stop, in many instances, to stop before proceeding across such railroad tracks, and a failure to do so constitutes contributory negligence in the event of an accident.

"(At these crossings where gatemen or flagmen are maintained, the rule is different.  In such instances, the pedestrian is not always required to look both ways and to listen before entering on the tracks or standing upon the tracks.  He has no right nor did the deceased in this case have any right to rely wholly or entirely upon the gateman or flagman for his own protection.  He must still notwithstanding a gateman or flagman is maintained, use his senses in such manner and to such extent as an ordinarily prudent person would use his senses in a similar or in the same situation, and under the same circumstances.  The public have a right to presume the flagman will perform his duty.  When a flagman is maintained and is not indicating by signal that a train or cars are approaching, as in this case, a question then is presented for the jury to determine whether or not under all the facts and circumstances, the pedestrian was deceived in assuming that the way was safe.  Of course, a man may not rely upon the flagman or gateman if he has actual knowledge that a train is approaching or that cars are approaching.  If he in fact knows a train is moving on the track he is not justified in relying on the flagman, but in the absence of notice to the contrary, when there is a regular flagman, and he is present, and not indicating by any signal of the approach of any train, it is for the jury to say in what manner and to what extent the traveler or pedestrian is justified in relying upon such presence of the flagman, and whether under the particular and peculiar circumstances of the case, the pedestrian was justified.)

"Whether or not the pedestrian was negligent, depends in a measure on whether or not he had a right to rely, under the circumstances, upon the presence, attitude, and appearance of the flagman, and whether or not he did in fact rely upon them.

"(It is not the law of this State that under all circumstances, that it is absolutely necessary for anyone approaching a railroad crossing to look both ways, and to listen for approaching trains.  It is generally required.  If there were no flagman at all at this crossing, none maintained there, then the rule would apply, but in cases where there are gates or where

there is a flagman, the rule does not always apply. Every case depends upon its own circumstances. A traveler in every case is only required to use such precautions as an ordinarily prudent man would use under like circumstances, and whether or not he did use such care, is generally as in this case, a question for the jury. It is for you as jurors to say whether or not under the circumstances, the plaintiff has a right to rely, and if he had such a right, then in fact, how far did he rely upon the presence, appearance and attitude of the flagman. If an ordinarily prudent man would have done the same as the deceased did under the circumstances with which he was confronted and surrounding him, and you find the defendant was guilty of negligence causing deceased's injuries, then of course plaintiff should recover.)"

There was a verdict for the plaintiff in the sum of $4,500, a judgment followed, and the defendant has brought the case here upon writ of error.

In appellant's original brief, filed in this court, reversal of this judgment is asked on the ground that the plaintiff failed to show by any evidence that her intestate was in the exercise of due care and free from contributory negligence; and that the plaintiff's intestate was guilty of contributory negligence. It is urged that the undisputed evidence showed that the plaintiff's intestate was not looking for, and did not see, the approach of the cars until too late to save his life, and that there was nothing to obstruct his view of the approaching train; and that it was simply a case of his attention being diverted from the danger of standing on the railroad tracks, while he engaged the crossing watchman in conversation. It is said by defendant's counsel that on the plaintiff's part the case was tried on the theory that this was a protected crossing; that plaintiff's intestate had a right to rely upon the flagman giving timely warning of the approach of the cars in question, even though engaged

215—Mich.—4.

in conversation with plaintiff's intestate. And it is claimed that the trial judge, throughout the trial, and in submitting the case to the jury, fell into the error of assuming that because it was a protected crossing, and a flagman was stationed there, that the plaintiff's intestate had a right to rely upon, the flagman's giving timely warning of the approach, no matter how his attention might be diverted. These claims of appellant are all covered by proper assignments of error. The following cases are cited by defendant's counsel in support of their position: *Grostick* v. *Railroad Co.,* 90 Mich. 594, and cases there cited; *Lau* v. *Railroad Co.,* 120 Mich. 115; *Tucker* v. *Railway Co.,* 122 Mich. 149; *Bennett* v. *Railway Co.,* 123 Mich. 692; *Smith* v. *Railway Co.,* 136 Mich. 282; *Berry* v. *Railway Co.,* 173 Mich. 181, and cases there cited; *Colborne* v. *Railway,* 177. Mich. 139, and cases there cited; *Beagle* v. *Railroad Co.,* 184 Mich. 17, 23, 24, and cases there cited; *Groves* v. *Railway Co.,* 210 Mich. 409, and cases there cited.

An examination of the foregoing cited cases will demonstrate that appellant's counsel are insisting upon the application of the ordinary rule in this State, which has been laid down in a great number of cases, that a person approaching a railroad track, knowing the same to be a place of danger, must stop, look and listen. There is no question that the general rule is well settled in this State by the foregoing authorities, as claimed by appellant. The vital question here is whether this case falls within that class, or, upon the other hand, whether it falls within the rule which has been adopted with reference to what may be termed "protected crossings."

It is the contention of plaintiff's counsel, in their brief and oral argument, that the instant case is not ruled by the authorities cited by appellant's counsel, and that the court correctly stated the rule in its

charge to the jury.   After discussing somewhat at length the question of defendant's negligence, and citing upon that question *Battishill* v. *Humphreys*, 64 Mich. 514; *Davis* v. *Railroad Co.*, 142 Mich. 382, and *Smith* v. *Railroad Co.*, 136 Mich. 224, counsel then proceed to discuss the question of contributory negligence of the plaintiff's decedent under the evidence in the case, contending that the question presented was one for the consideration of the jury.   They cite *Rouse* v. *Blair*, 185 Mich. 632, and *Garland* v. *Railroad Co.*, 196 Mich. 695, 701, to the point that this court has recognized various exceptions to the general rule of requiring the traveler to stop before making a crossing.   Attention is called to the following in the case of *Garland* v. *Railroad Co.*, *supra:*

"Should we, as a matter of law, determine that under the circumstances of this case the plaintiff is guilty of contributory negligence?   We have repeatedly stated that before such a conclusion can be arrived at, all reasonable minds should reach the same conclusion, that under all the circumstances the plaintiff's contributory negligence should bar recovery.   See *Beach* v. *City of St. Joseph*, 192 Mich. 296, and cases therein cited."

It is urged that whether the plaintiff's decedent acted as a reasonably prudent person would have acted under all the circumstances was a question which it was only proper for the jury to determine.   We have in this case quoted at great length the testimony of the flagman, in order to fairly show the surrounding circumstances.   It is claimed by appellant that plaintiff's decedent having engaged the flagman in conversation and thus diverted his attention, the plaintiff cannot invoke the doctrine applied to protected crossings.   In our opinion the circumstances shown by the testimony of this witness were very proper to be submitted to the jury, and it was for the jury to say

whether, under all of the circumstances of the case, the plaintiff's decedent exercised the care that a reason-ably prudent person would have exercised under like ci cumstances. The testimony of the flagman is not to the effect that his attention was so diverted that he did not see the approaching cars. He saw the cars, according to his own testimony, when they were at First street, a distance of at least 400 to 500 feet away, and in our opinion it was fair to submit to the jury the question whether he did his duty, having seen the cars at that distance without having called the attention of plaintiff's decedent to them; for he says that he did not call deceased's attention to them until they were nearly upon them—only a few feet away. The conduct of both the flagman and the deceased was material. Is it possible that the decedent should be held guilty of contributory negligence as a matter of law, because he spoke to the flagman and made a civil inquiry as to the location of First street? It seems to us that this was not a question of law for the court, but was one of fact to be submitted to the jury under proper instructions.

Counsel for plaintiff quote from *Davis* v. *Railroad Co.*, *supra*, the following language:

"A delay of a few seconds to turn and call his dog, or a delay for a little time when acquaintances meet upon a sidewalk to talk, is not *per se* negligence under such circumstances. Parties have the right to assume that the railway company will give them warning at such places before moving the car in their direction. It is a duty which such companies owe to the travel-ing public, and when travelers, for a legitimate pur-pose, stop on the sidewalk for a few seconds, it does not follow that they are *ipso facto* guilty of negli-gence."

At the hearing, counsel for plaintiff cited the fol-lowing additional authorities: *Richmond* v. *Railway*

*Co.*, 87 Mich. 374, and called especial attention to the language of Justice MORSE (who wrote the prevailing opinion in that case) upon the subject of contributory negligence.     Upon the subject of the flagman, whose duty it was to signal by a flag the approach of trains, Justice MORSE there said, at p. 380:

"It is not the law of this State that, under all circumstances, it is absolutely necessary for a person approaching a railroad crossing to look both ways and to listen for approaching trains.     It is generally required, but it is not a rule of universal application.     Every case must depend upon its own circumstances, and it would be unreasonable to apply such a rule, under all circumstances, without regard to the condition of things at the time.     *Cooper* v. *Railway Co.*, 66 Mich. 266.     Nor is a traveler compelled, under all circumstances, to stop before crossing, if his view is obstructed from one way. He is only required to take such precaution as an ordinarily prudent man would under like circumstances, and whether or not he did use such care is generally a question for the jury.     See *Guggenheim* v. *Railway Co.*, 66 Mich. 157, 158, and cases cited."

We invite attention to the further language used in that opinion.

Plaintiff's counsel also cite the following cases: *Tobias* v. *Railroad Co.*, 103 Mich. 330; *Beauerle* v. *Railroad Co.*, 152 Mich. 345; *Coston* v. *Railroad Co.*, 201 Mich. 232; *Crawford* v. *Railroad Co.*, 207 Mich. 159.     These cases are applicable to what may be termed "protected crossings."     They are well considered cases, and in our opinion are decisive of this case.

The rule has been repeatedly laid down by this court that the question of contributory negligence can be determined as matter of law only when the circumstances are such that all reasonable minds would reach the same conclusion.     Where it is so clear from the

evidence that a verdict ought not to stand, if one were rendered, where the contributory negligence is so apparent that reasonable minds could draw but one conclusion from it, then the court is warranted in saying, as matter of law, that plaintiff is negligent, and so is precluded from recovery.   In every other case it is the duty of the court to submit the question to the jury under the evidence, and it is for them to say, instead of the court, whether or not the plaintiff was guilty of contributory negligence in doing as he did.

Taking into consideration all the circumstances surrounding the case, we cannot say, as matter of law, that plaintiff's decedent was guilty of contributory negligence, and we agree with the trial court that the question was for the jury; and in our opinion the case was properly submitted to the jury, upon both that subject and the subject of the negligence of the defendant.

We do not consider it a fact controlling of the case that plaintiff's decedent came down to Third street upon defendant's right of way.   At the time he was hit, and when it is claimed he was guilty of contributory negligence, which was the proximate cause of the injury, he was in a public street, standing, it is true, too near the track.   The fact that he was talking with the flagman, and what occurred there, was a circumstance to be considered by the jury upon the question of contributory negligence.

We do not hold it to be the rule that because a railroad company maintains a bell, or a gate, or a watchman, or flagman, at a crossing, one about to use the crossing may depend for his safety *entirely* upon the gate, bell, watchman, or flagman, but what we do hold is, that under such circumstances as are here shown it becomes a question for the jury to say whether the conduct of the person was that of an

ordinarily prudent person, under all the circumstances of the case.

Counsel for appellant, in their brief, refer to the admission in evidence of a photograph of plaintiff's decedent, accompanied by a display of grief of plaintiff, and claim that it was error. They do not discuss the matter in their brief further than to mention the subject and claim error. There was testimony in the case showing the age of plaintiff's decedent to have been 39 years, and that he was a well and robust man, and it is difficult for us to see wherein the defendant was injured by the introduction of this photograph, which would have a tendency to show deceased's physical appearance and condition when taken. We think the rule is well stated in 10 R. C. L. p. 1154:

"The admissibility of a photograph in evidence is a question addressed largely to the discretion of the trial court, and its decision will seldom be reviewed by an appellate tribunal."

We do not think the reception of this photograph in evidence constituted reversible error.

We find no reversible error in the record. The judgment of the circuit court is therefore affirmed.

STEERE, C. J., and MOORE, WIEST, BIRD, and SHARPE, JJ., concurred with STONE, J.

CLARK, J. (*dissenting*). I am unable to concur in the opinion of Mr. Justice STONE. Plaintiff was guilty of contributory negligence as a matter of law. Defendant was entitled to a peremptory instruction to that effect. The quoted theory and rule that a plaintiff shall not be held guilty of contributory negligence as a matter of law unless and until all reasonable minds shall so agree may be applied to a case of first impression. It can have no force as against precedent, controlling opinions of this court.

Of the question and upon the facts here presented the case of *Beagle* v. *Railroad Co.*, 184 Mich. 17, is decisive. The duty of the flagman was to warn travelers upon the highway against crossing the track in times of danger. Deceased was not a traveler along the highway. In his journey along the railroad track he came to a point on the track and in the highway where he stopped and engaged the attention of the watchman. It was early evening though the watchman was using a lantern, not the "stop" signal. Deceased on the track was in a place of known danger. He took no precaution for his safety. He could have seen these cars had he looked. A witness for plaintiff saw the cars when they were 300 or 400 feet from where deceased and the watchman were standing and said "I think from where Farrell (the watchman) stood they could see clear to Grace street if they had looked." Grace street was three blocks distant. If deceased had been a traveler along the highway the fact that a watchman was on duty at the crossing would not have excused him from looking and listening and taking thought for his safety and he could not have relied wholly upon the watchman for his safety in crossing the tracks. See *Beagle* v. *Railroad Co.*, *supra*, and cases cited. Nor could deceased, being upon the track, in a place of known danger, rely wholly upon the watchman to rescue him from such danger or to warn him of the approach of cars upon the tracks. The failure of deceased, under the circumstances, to take any thought or precaution for his safety precludes recovery. See *Smith* v. *Railway Co.*, 136 Mich. 282; *Berry* v. *Railway Co.*, 173 Mich. 181; *Gillett* v. *Traction Co.*, 205 Mich. 410; *Colborne* v. *Railway*, 177 Mich. 139; *Manos* v. *Railway*, 168 Mich. 155; *Matta* v. *Railway Co.*, 69 Mich. 109; *Kwiotkowski* v. *Railway Co.*, 70 Mich. 549; *Miller* v. *Railway*, 200 Mich. 388; *Strong*

v. *Railway Co.,* 156 Mich. 66; *Pershing* v. *Railway Co.,* 206 Mich. 304; *Hardy* v. *Railway Co.,* 208 Mich. 622; *Groves* v. *Railway Co.,* 210 Mich. 409.

Judgment should be reversed, with costs to defendant, and a new trial granted.

FELLOWS, J., concurred with CLARK, J.