COSTON *v.* ANN ARBOR RAILROAD CO.

1. RAILROADS—CROSSING ACCIDENT—DEATH — NEGLIGENCE — QUESTION FOR JURY.

In an action against a railroad company for the negligent killing of plaintiff's decedent by a collision at a crossing between defendant's engine and a buggy in which decedent was riding, evidence as to defendant's negligence in failing to ring the bell on the engine, in failing to keep electric crossing bell in proper repair, and the excessive speed of the train, in view of all the surroundings, *held*, to present a question of fact for the jury.[1]

2. SAME—CONTRIBUTORY NEGLIGENCE—RELIANCE UPON ELECTRIC ALARM BELL—QUESTION FOR JURY.

In such action, where defendant had for several years maintained an electric alarm bell at the crossing, and deceased had knowledge of the existence of the bell and was familiar with the crossing, having driven over it daily to his work for about a year, in the absence of any evidence that deceased had knowledge that the bell was out of order on the night of the accident, or that it had ever failed to ring when a train passed, the question of his contributory negligence in failing to stop, look and listen, and the extent to which he might rely upon the warning of the bell, *held,* for the jury, under proper instructions. OSTRANDER, C. J., and FELLOWS, J., dissenting.

3. SAME—ORDERS OF STATE RAILROAD COMMISSIONER—PRESUMPTIONS.

Where an electric alarm bell was installed at a railroad crossing as part of a signal system under an order of the State commissioner of railroads, the order would be presumed to continue in effect, in the absence of proof to the contrary.

4. SAME—HIGHWAY CROSSING—PROTECTION OF TRAVELING PUBLIC.

Where two railroads crossed each other at a highway crossing, it cannot be contended that an electric alarm bell, installed by order of the State commissioner of railroads, was intended solely for the protection of the railroad companies and their passengers, since orders of this nature in reference to crossings on highways concern the general

---

[1] See notes in 3 L. R. A. (N. S.) 391; 8 L. R. A. (N. S.) 1063.

public using the highway on foot or by private conveyance.

Error to Gratiot; Searl, J. Submitted April 11, 1917. (Docket No. 171.) Decided June 3, 1918. Rehearing denied July 18, 1918.

Case by John Coston, administrator of the estate of Loren Barnes, deceased, against the Ann Arbor Railroad Company for the negligent killing of plaintiff's decedent. Judgment for plaintiff. Defendant brings error. Affirmed.

*Gustavus Ohlinger* and *O. G. Tuttle* (*Alexander L. Smith*, of counsel), for appellant.

*Edwin H. Lyon* and *John W. Myers*, for appellee.

STEERE, J. Plaintiff brought this action as administrator of the estate of Loren Barnes, deceased, to recover damages for the latter's death caused by one of defendant's trains striking a conveyance he was driving over its crossing at Corunna avenue in the city of Owosso on the evening of February 4, 1911. The corporate limits of Owosso extend about four blocks east of this crossing beyond which Corunna avenue continues as a country highway in a southeasterly direction for about a mile, when it reaches the westerly corporate limit of the village of Corunna which is the county seat of Shiawassee county. At the crossing where the accident occurred it is an ordinary unpaved suburban dirt street. That portion of the city is sparsely settled, there being no building to the west of the crossing, towards Owosso, nearer than 155 feet, which is a church on the south side of the avenue, while to the east, on the same side of the street, the first building, called the Burns' house, is 316 feet east of the crossing. The next house east of Burns' on the same side is 360 feet beyond the crossing. An electric railway connecting Owosso and Corunna runs along

the south side of the main traveled portion of Corunna avenue, with an hourly service each way between the two places. A so-termed "half interlocking switch and signal system" had been maintained for some years at this crossing of the two lines under an order of approval and conditions imposed by the State commissioner of railroads. The derailing devices were connected with the electric line tracks and on defendant's line an electric alarm bell was installed at the crossing which would automatically begin to ring on the approach of a train from the southeast when it reached a semaphore 809½ feet from the center of the crossing. Plaintiff's testimony showed this electric bell had several times been out of order during the winter, sometimes continuing to ring after the train passed and at other times not ringing at all; that it was out of order so it did not ring when trains passed on the evening of the accident nor two days before; that the train which struck Barnes' buggy had not reduced its speed on coming into the city but was running from 25 to 35 miles an hour and did not ring its bell or sound its whistle on approaching the crossing.

Barnes had resided in or near Owosso 14 years, and was at the time of his death 33 years of age, married but without issue. For two years prior to the accident he resided near a mile east of this crossing and about a block from Corunna avenue. He was regularly employed at a factory in Owosso and during that time passed over this crossing daily in going to and returning from his work. For about a year before his death he rode, using a horse and single seated top buggy. This horse was a gentle animal 15 years old, "a steady driver" and would stop readily on pull of the reins. The night of the accident was dark and cold, with the wind blowing sharply from the northwest. In the evening after supper deceased started to drive from his home into the city with his wife and a young girl

named Najel Swarthout, then 10½ years of age, who resided with them. She testified that it was cold and they were bundled up, the top of the buggy being up, with the side curtains on and the back closed. Barnes' wife sat on the left, or southerly side of the buggy as they approached Owosso, the girl on the right, and he sat between them on their knees leaning forward as he drove along, the horse sometimes walking and sometimes trotting but she could not tell just where or when; that Barnes was a little in front of her and appeared to be looking straight ahead, although she could not tell the way he was looking from where she sat; that she knew he was awake because they talked more or less as they rode along and she recalled his talking with his wife about curtains and carpets for the house; that she did not remember the horse stopping at any time or his using the whip on it; that he appeared to be looking straight out of the front of the buggy as they approached the crossing and she simply knew the buggy kept right on going all the time until the accident; that nothing unusual occurred to attract her attention, she heard no alarm bell, whistle nor other sound or signal of an approaching train and thus describes the event as known to her:

"The first thing I knew of this train I was on the pilot. I do not know what became of Mr. Barnes when the train struck the rig. I knew Mr. Barnes was killed. * * * The thing I knew about the engine was when I found that I was on the cow-catcher. Mrs. Barnes was on the cow-catcher too."

This girl is the only direct witness to the accident and what Barnes did or failed to do in avoidance of it. Neither deceased's wife nor any of the train crew were called as witnesses.

The train was stopped with its rear about 400 feet beyond the crossing and the engine standing a little northwest of the north semaphore, which is 735 feet

from the crossing. The girl and Mrs. Barnes had been thrown upon the cow-catcher, where they rode until the train stopped, and sustained little if any injury. Barnes was found dead under the engine, wound around the axle just back of the drive-wheel. The train which struck deceased was defendant's northbound passenger train No. 3, consisting of four cars and the engine, due at Owosso at 7:30 p. m. and was over 20 minutes late at the crossing.

The case was submitted by the court to the jury on the issues of negligence and contributory negligence, resulting in a verdict for plaintiff. While numerous assignments of error are urged and argued on various phases of the case, the basic question most meriting consideration is defendant's contention that plaintiff's testimony shows deceased to have been guilty of palpable contributory negligence precluding recovery.

The charges of negligence against defendant submitted to the jury were, as stated by the court:

"*First.* The failure to ring the bell on the engine; *second,* the question of the electric bell being out of order and the knowledge which the defendant railroad company had that the electric bell was out of order; *third,* the speed of the train and the manner in which the train was handled by reason of the fact that the electric bell was out of order, if it was out of order, and by reason of all the surroundings at the crossing there."

While various features of defendant's alleged negligence are debated at length in the briefs of counsel, it clearly appears there was abundant testimony to carry the question of defendant's negligence to the jury as an issue of fact in the particulars stated by the court.

On reaching the question of contributory negligence the court instructed the jury:

"The plaintiff must go further and show that Barnes himself was free from any negligence which contributed to the accident in question, to bring about his

death.  It ordinarily is the duty of a person driving upon the highway, as Barnes was driving on that night in question, in approaching a railroad track, to stop and look and listen for approaching trains, and ordinarily, if a man does not do all these three things, he is held to be guilty of contributory negligence and cannot recover.  But there are some exceptions to this general rule, and I charge you in this case that if the electric bell had been stationed there, and Barnes knew of the fact that it had been—and there seems to be not much dispute about that—and if you find that it had gotten out of order and the company knew that and Barnes didn't know it, then Mr. Barnes had a right to rely to some extent upon the fact that the electric bell would give warning to him and he would not necessarily be guilty of contributory negligence because he didn't entirely stop his horse before driving across the track.  But it would still be his duty, gentlemen, to approach the track in a careful manner, even if he didn't stop, and at a reasonably slow rate of speed so that he might keep a look-out for trains that were coming upon the track, and it would still be his duty to look and to listen for approaching trains, even though he was relying upon the ringing of the bell, because one may not approach a railroad track even though he expects a warning bell to ring, without using his senses and using reasonable care, such care as a reasonably prudent man would exercise under the circumstances, before crossing it, and unless he does that, he cannot recover even though the company may have been guilty of some act of negligence upon their part."

After discussing certain related features of the question including deceased's familiarity with the locality, the court further said:

"I will charge you, now, gentlemen of the jury, that if you should find that Mr. Barnes knew this bell was out of order on the night in question, there can be no recovery in this case.  Because if he knew the bell was out of order, he didn't use reasonable diligence in approaching that crossing.  He should have done more than the evidence shows that he did do in this case."

In submitting the case to the jury under this instruction, the trial court was apparently governed by the ruling in *Tobias* v. *Railroad Co.*, 103 Mich. 330, where, as here, a fatal accident resulted from plaintiff's intestate driving upon defendant's track without stopping to look or listen at a crossing near his house, which he was accustomed to pass frequently, where an electric bell had been installed and maintained to give warning of an approaching train, but was claimed to have been out of order on the night in question. It is there said the whole evidence indicated that if deceased had looked he could have seen the train in time to avoid it and the court should have directed a verdict in favor of defendant, but for the question of the maintenance of an electric bell, by reason of which it was held error for the trial court to refuse plaintiff's request to submit the case to the jury under an instruction that if the bell did not sound its usual alarm on approach of the train and deceased did not know of any fault in the condition of the bell, that fact could be taken into consideration by the jury, together with all other facts in the case as bearing upon the question of his contributory negligence.

It is contended by defendant that the *Tobias Case* is not controlling, being distinguishable in the particulars that it was not there shown the bell had been out of order on previous occasions and deceased, being alone, was presumed to have exercised ordinary care and caution, while in the instant case there were eyewitnesses to the accident and it was shown the bell was frequently out of order to deceased's knowledge, plaintiff's testimony showing that he had observed and spoken of it.

The trial court charged the jury here, as was held by this court in the *Tobias Case,* that in the absence of knowledge the bell was out of order and inferable dependence upon its giving warning, the party killed was conclusively shown to be guilty of contributory negli-

gence as a matter of law, because he could have seen the approaching train had he stopped, looked and listened, and as to the physical facts of the accident, aside from the question of the electric bell, the presumption of freedom from negligence was overcome by evidence to the contrary. The facts which eyewitnesses might observe at either accident would not disclose decedent's previous knowledge as to the electric bell being out of order, or whether he depended upon its ringing to warn him of an approaching train. Why that element carried the question of contributory negligence to the jury is thus explained in the *Tobias Case:*

"It cannot be said that the deceased would have no right to rely upon the ringing of this electric bell to warn him of the approach of the train. If the electric bell had rung, it would have given him warning. That he expected it to ring might make him less cautious in looking for the coming of a train."

It was shown that the bell in the instant case had been out of order and did not operate as intended at different times prior to this accident and that deceased had noticed it ringing when no train was passing, for which reason defendant urges the court should hold as a matter of law that he had no right to rely upon its giving warning, and the fact that it was maintained there could not be considered by the jury as a mitigating element in excuse or justification of his otherwise shown contributory negligence. As to the testimony upon that feature of the case, although it appears Barnes customarily passed over this crossing in going to and returning from his work it is nowhere shown that he did so at a time when trains regularly passed there, neither are we able to find any direct testimony that he ever knew of this signal bell failing to ring when a train passed. His brother did testify that about two months preceding the accident, and prior to that, they drove over the crossing together

when the bell was ringing continuously with no train passing or standing there, and they both noticed the fact. What notice or knowledge Barnes had that the bell ever remained silent when a train passed the crossing is a matter of inference upon a question of fact as to which different minds might honestly draw from the testimony different conclusions.

This electric alarm bell was installed as part of a signal system under an order of the State commissioner of railroads, made February 23, 1905, and the installation was approved after inspection by a supplemental order of July 11, 1905, subject to the condition that if the signals were clear trains of defendant's road might pass the crossing at a speed not exceeding 20 miles an hour, and the further condition that —

"If from any cause the said interlocking switch and signal system shall become inoperative and cease to work satisfactorily, the signal shall at once be set to danger and a flagman stationed to signal approaching engines or cars on both of said railroads, which engines or cars must in all cases be brought to a full stop at the said crossing before passing over the same, as required by law, until the said appliance has been restored to perfect working order."

It is now urged that defendant so habitually violated and persistently ignored this order that Barnes must be conclusively presumed as a matter of law to have known it and therefore had no right to rely on the bell sounding a warning or, in case it was out of order and failed to ring, of a flagman being stationed there to signal approaching engines or cars.

Counsel for defendant objected to and assigns as error the admission of this order in evidence on the ground it was not shown to be in effect when the accident occurred. Having been promulgated and put into effect, and the installation made in compliance with it having been inspected and approved by the commissioner, such an order would be presumed to continue in

effect, in the absence of proof to the contrary. It is also seriously contended that this order was made solely with reference to the traffic of the two railways crossing each other at that point, for the protection of their property and passengers only, for which reason those using the highway and about to cross defendant's track had no right to take it into consideration or in any manner rely upon its being complied with. Orders of this nature in reference to crossings on highways do concern the general public as well as the railways and their patrons. They establish a particular system of safety alarm which if not a protection to those using the highway tends to divert from the customary signals and mislead. This intersection of the railways was on the main thoroughfare between Owosso and Corunna, the county seat of the county in which both were located. Defendant's line approached it from the south on a curve and crossed it diagonally; it was within the power of the railroad commission to make this order, and when the system was installed with an alarm bell to give warning of an approaching train which all approaching the crossing could hear, it cannot be said that it was not intended to and did not mean anything to that portion of the public using the highway on foot or by private conveyance. Such warning bells are not required or customary at ordinary highway crossings and when installed are inevitably a notice to the general public that the ordinary means of warning at a highway crossing are inadequate for that particular place, which would naturally tend to divert the vigilance of those regularly using the highway from the ordinary methods of warning. This bell had been maintained by defendant at the crossing where the accident occurred for several years. How it came to be installed, the manner in which it operated, the extent to which it was kept in working

order, deceased's knowledge of its condition and the extent to which he in the exercise of reasonable caution and prudence might and did rely upon it were, under the *Tobias Case,* questions for the jury. The trial court narrowed the issue of contributory negligence to Barnes' dependence upon this bell taken in connection "with all the other circumstances surrounding the crossing," confined the significance of the surrounding circumstances to that question, and distinctly charged the jury that, regardless of the evidence of defendant's negligence in other respects, recovery could only be had in case the electric bell was out of order when the accident occurred and failed to give its customary warning, that defendant had knowledge of that fact and Barnes did not. The case went to the jury upon that question under fair and proper instructions.

In that aspect of the case many of defendant's assignments of error upon the admission of testimony become unimportant, and without reviewing at length the many other assignments of error urged we deem it sufficient to state that from the record considered in its entirety we cannot affirmatively find that the errors complained of have resulted in a miscarriage of justice, or that any prejudicial error demanding reversal of the case is made manifest.

The judgment will therefore stand affirmed.

BIRD, MOORE, BROOKE, STONE, and KUHN, JJ., concurred with STEERE, J.

OSTRANDER, C. J. (*dissenting*). The opinion of the court, in dealing with the question of the contributory negligence of plaintiff's decedent, while professedly grounded upon *Tobias* v. *Railroad Co.,* 103 Mich. 330, in my opinion very greatly extends the rule announced in that case. I do not understand it to be the rule that, because a railroad company maintains a bell or

a gate or a watchman at a crossing, one about to use the crossing may depend for his safety entirely upon the gate, bell, or watchman. That his conduct may be affected by the fact that a gate is up, the flagman is not in his usual position, or that a bell does not ring, is true, and to this extent, and no further, goes the rule employed in *Tobias* v. *Railroad Co.* Mr. Tobias was alone when he was killed. The legal presumption is that he was careful for his own safety, that he took or attempted to take the precautions which a prudent man under the same circumstances would have taken. The undisputed evidence in the case at bar is that plaintiff's decedent took no precautions whatever, unless it can be said that he listened. The occupant of the carriage, who gave testimony, could not know, of course, whether he listened, because one may listen without particular movement or action, but, if he listened, he took no other precaution for his safety, and it is obvious he *took no precaution* to listen for any sound unless it was the ringing of the bell. It was a cold night. The side and back curtains of the carriage were drawn. The occupants of the carriage were protected from the cold by clothing, two of them, at any rate, by extra clothing. Common prudence, ordinary care, required some further effort to ascertain whether the advertised danger of crossing was imminent. In my judgment, the reasoning of the opinion of the court in effect excuses persons situated as the plaintiff's decedent was situated from doing the obviously prudent thing.

FELLOWS, J., concurred with OSTRANDER, C. J.