Eugene LUDWIG, Guardian of the Estate of Michael Paul Zatek, a Minor,

Teresa Serratoni, Administratrix of the Estate of Joan Ellen Zatek, Deceased,

Teresa Serratoni, Administratrix of the Estate of John Michael Zatek, Deceased,

John Zatek and Wolverine Insurance Company

v.

The CHESAPEAKE AND OHIO RAIL-WAY COMPANY.

Nos. 21997, 21998, 21999, 22025.

United States District Court
E. D. Michigan, S. D.

Dec. 27, 1962.

Frederick D. Jasmer and Joseph B. Evanski, Cassese, Batchelder, Jasmer & Evanski, Detroit, Mich., for plaintiffs.

Robert A. Straub and James R. Gannon, Detroit, Mich., for defendant.

DECISION OF THE COURT ON DEFENDANT'S MOTIONS TO SET ASIDE JURY'S VERDICTS AND TO ENTER JUDGMENTS IN FAVOR OF THE DEFENDANT IN FOUR OF THE CONSOLIDATED CASES (Dictated from the Bench)

FREEMAN, District Judge.

These cases arise out of a railroad grade crossing accident involving one of the defendant's freight trains and a Chevrolet station wagon automobile owned by the plaintiff John Zatek, and are now before the Court on motions of the defendant Chesapeake and Ohio Railway Company to set aside jury verdicts and to enter judgments in favor of defendant in four of the five cases filed as a result of this accident and tried pursuant to an agreed order of consolidation.

The entry of judgment on a verdict of no cause of action in favor of defendant in the other companion case No. 21992 awaits the disposition of these motions.

The accident occurred on June 16, 1961, at about 4:30 P.M., when defendant's eastbound freight train struck the automobile then being driven by Mr. Zatek's wife, Lois Jane Zatek, in a southerly direction on Middlebelt Road, in the City of Livonia, Wayne County, Michigan, which automobile had stalled on the track in the path of defendant's oncoming train. Three small children of Mr. and Mrs. Zatek were also occupants of the car. Mrs. Zatek and two of the children were killed. The other child was injured, and the automobile was demolished. As a result, five separate suits were filed against the railroad by Mr. Zatek and the personal representatives of the estates of the deceased wife and children, and the guardian of the estate of the injured child.

Plaintiffs claimed at the outset of the trial that the railroad was negligent in failing to perform certain alleged duties, and also invoked the doctrines of an extra hazardous crossing and last clear chance, all of which were withdrawn by plaintiffs at the close of their testimony, except the claims that (1) the speed of the train was excessive; and (2) the engine crew failed to keep a proper lookout at the crossing, on which issues the cases were submitted to the jury, together with the issue of contributory negligence based on defendant's claim that Mrs. Zatek, the driver of the car, was guilty of negligence which would bar recovery in her case, and which was also the sole proximate cause of the accident, which would bar recovery in the other cases.

Middlebelt Road at this crossing was a straight, level, paved, 4-lane highway, extending in a north and south direction. Defendant's tracks, consisting of two main lines and three spur tracks, crossed the highway at right angles, and extended straight and almost level both east and west for several miles from the crossing, which was approximately 1½ feet above the level of Middlebelt Road measured from a point about 100 feet north of the crossing. There was a race track on the east side of Middlebelt Road, and a Kroger Company warehouse on the west side of the road, both north of the crossing. There was a Ford Motor Company laboratory and parts depot on the west side of Middlebelt Road south of the crossing. Otherwise, except for a few scattered buildings, the surrounding area for a mile in every direction from the crossing was characterized as "open, pretty much open" by plaintiff's witness Thorne, a Livonia police officer. There was no obstruction to the view of a southbound motorist of trains approaching the crossing from either direction.

This crossing had maximum statutory protection, consisting of flasher lights and bells, with the customary cross-buck "Railroad Crossing" sign, and half-gates which were installed in 1950 pursuant to an order of the Michigan Public Service

Commission. The day was bright and warm. Visibility was unusually good at the time of the accident.

The defendant's engine was blowing its whistle and ringing its bell. The protective devices and signals at the crossing were all in good operating condition.

In this setting Mrs. Zatek, with her three children in the car, approached the crossing from the north, and the car stalled on the third set of tracks, which would be the middle set of tracks, in the path of defendant's eastbound freight train, resulting in the disaster already mentioned.

Defendant's motions for directed verdicts, made at the close of plaintiff's proofs, were denied, and were renewed at the close of all the testimony, which motions were then taken under advisement. The jury rendered a verdict of no cause of action in the case for the wrongful death of Mrs. Zatek, and rendered verdicts in favor of plaintiffs in the other four cases.

The instant motions of defendant to set aside the verdicts in favor of plaintiffs and to enter judgments of no cause of action in all cases followed. Oral arguments were heard on September 24, 1962, and again briefly on this date.

Plaintiffs contend that the issues of (1) whether the speed of the train, or (2) whether the engine crew maintained the required lookout, constituted negligence on the part of the railroad, and the causal connection of such negligence with the accident were questions for the jury, and were properly submitted to the jury.

Defendant contends that, as a matter of law, it was not guilty of negligence on either ground claimed by plaintiffs, and that the negligence of Mrs. Zatek in driving the car was the sole proximate cause of the accident.

In considering and deciding these motions, the evidence and all inferences which may reasonably be drawn therefrom must be viewed in the light most favorable to the plaintiff.

First of all, I will consider the issue of whether the speed of the train, under the circumstances then prevailing, was a question for the jury on the issue of negligence.

In a very fine annotation on this point, cited and referred to by counsel in their brief, and on oral argument, in 154 A.L. R. at page 213, and which appears to be the only annotation in this text that the court has been able to find, the author, at page 213, says:

> "It may be said that the general rule is that the question whether the speed of a train, locomotive or railway car at a highway crossing constitutes negligence depends upon the circumstances of the particular case."

At almost the outset of this annotation, the author says:

> "The recent trend of decisions, however, is to the effect that speed does not constitute negligence, in the absence of a statute or ordinance limiting speed, where adequate warnings of the approach of trains are given to persons using the highways, or where suitable protective measures have been resorted to, and that speed is only material where adequate warnings are not given or such protection is not afforded."

At pages 1390 and 1391 of 74 C.J.S. Railroads § 744, the text reads as follows:

> "In the absence of statutory or municipal regulations a railroad company has the right to use its discretion in establishing the speed of its trains; but the mere fact that there is no statutory limitation on the speed of trains through cities does not permit a negligent, excessive rate. Generally no rate of speed consistent with the safety of passengers and freight is negligence per se. However, under the rule of the common law requiring a company to exercise its franchise with due regard to the safety of its passengers and such persons as may travel on

a highway crossing its tracks, it is the duty of the company, in establishing the rate of speed at which its trains may be run, and of the trainmen in operating the train, to exercise due regard not only to the safety of passengers, but also to that of all persons in the exercise of ordinary care traveling on the highway across its tracks; and whether the rate of speed in any particular case is reasonable or negligent depends on the nature of the crossing and other circumstances of the case."

■ The law is well settled in Michigan that it would not be negligence for a railroad to operate its trains at a rapid rate of speed through open rural country. See Elias v. Collins, 237 Mich. 175, 211 N.W. 88, 52 A.L.R. 1118; Buchthal v. N.Y.C. R.R. Co., 334 Mich. 556, 55 N.W.2d 92. Also see Penn. R.R. Co. v. Stegaman, a 6th Circuit case, reported in 22 F.2d 69, applying Ohio law; Carter v. Pennsylvania, another 6th Circuit case, reported in 172 F.2d 521, also applying Ohio law; and Plough v. Baltimore & O. R.R., a 2nd Circuit case, reported in 172 F.2d 296, applying New York law.

In the Buchthal case the train was proceeding at a speed of 80 miles an hour, according to the engineer, and struck plaintiff's automobile at a rural crossing. In that case the court said, at page 562 of the opinion in 334 Mich., at page 95 in 55 N.W.2d:

"We held that the general rule is that when running through open country the speed of trains is not limited. We cited Robinson v. Flint & P.M. R. Co., 79 Mich. 323, 44 N. W. 779, an early case, where we held that a speed of 60 miles an hour was not evidence of negligence. In Shufelt v. Flint & P.M. R. Co., 96 Mich. 327, at page 329, 55 N.W. 1013, at page 1013, we said: 'Trains are not limited in the rate of speed they may run in the country, and across the public highways, where the travel is limited.' "

■ It also seems clear, under the law of Michigan, that whether the speed of a train through a village or city may constitute a question for the jury as to the issue of negligence depends upon the circumstances of each case. See Hudson v. G.T.W. R.R., 227 Mich. 1, 198 N.W. 339, and Morgan v. Detroit, J. & C. Ry., 234 Mich. 497, 208 N.W. 434.

The circumstances to be considered on this issue, among others, as set out in the Morgan case, at page 501 of the opinion in 234 Mich., 208 N.W. 434, consist of several factors:

(1) The population of the village or city;

(2) How well the crossings were guarded;

(3) How straight the track was;

(4) How much travel there was in the village or city;

(5) To what extent was the view of the railroad track obstructed.

There is no statutory speed limit on trains in Michigan, and the city of Livonia has not restricted the speed of trains by ordinance.

Defendant's train involved in this incident consisted of 79 freight cars, 61 loaded and 18 empty, a caboose and a 3-unit diesel locomotive, having an overall length of 3720 feet. The total weight of the train was 4375 tons, according to the defendant, and 4136 tons according to the plaintiffs. The flashing lights, bells and gates at the crossing were automatically actuated by the lead unit of a train at the point of an actuating device attached to the track 3018 feet west of the crossing. The front of the diesel engine stopped 2632 feet east of the crossing after the accident, according to the testimony of plaintiffs' witnesses. There is a delay of 1½ seconds after the train reaches the actuating device in the track before the flasher lights and bells at the crossing start to operate. There is an additional delay of 5 seconds before the gates start to descend, which is in accordance with the regulations of the Michigan Public Service Commission. Eleven seconds is required for the gates

to reach a fully horizontal position after they start to descend.

Plaintiffs' expert witness Kurt testified that the ordinary average human reaction time is three-fourths of a second. None of plaintiffs' witnesses saw Mrs. Zatek drive upon the track where the car stalled, and therefore were unable to say how long the car was on the track when it was struck. Two of these eye witnesses testified that the gates were down and the lights were flashing when they first saw the Zatek car, at which time it was stalled on the track. Another witness saw the car stalled on the track, but has no recollection as to the position of the gates at that time.

Another of plaintiffs' eye witnesses, Jerome Fine, testified that the automobile was standing still on the track when he first observed it, at which time "the gates were coming down," immediately followed by the further answer of the eye witness Fine: "They were a quarter of the way down."

Defendant offered the testimony of two witnesses who saw the accident to the effect that the Zatek car was going very slow as it approached the crossing, and passed under the north gate in a so-called creeping manner as the gate was descending, before stopping on the track. The distance from the gate to the track where the accident happened was 43 feet.

I cannot consider the testimony of defendant's witnesses with respect to this point, because I must weigh the evidence in the light most favorable to the plaintiffs. I merely make reference to that testimony to indicate that there were other witnesses who claimed to have seen the Zatek car approach the crossing and stop on the track.

Having offered no direct evidence of the movement of the automobile as it approached the crossing, or how long it was on the track before the impact, plaintiffs relied on the time interval of 6½ seconds after the train reached the device for actuating the crossing flashers and gates, 3018 feet west of the crossing, before the gates started to descend, at which time the witness Fine said that Mrs. Zatek was on the track, plus three-fourths of a second reaction time for the engineer to apply the brakes, making a total of 7¼ seconds which elapsed after the train triggered the actuating device, and was some evidence, according to plaintiffs, of the position of the engine when Mrs. Zatek was on the track, at which time plaintiffs claim the engineer should have applied the brakes.

Plaintiffs' expert witness Simpson testified that if the brakes on the train were applied 1185 feet west of the crossing, as stated by the engineer to one of plaintiffs' witnesses, the speed of the train at that point would have been 62.8 miles per hour; and the stopping distance of the train, after application of the emergency brakes, under those circumstances, would be 3817 feet.

Defendant's answers to plaintiffs' interrogatories state, among other things, that the speed of the train was about 60 miles per hour when the brakes were applied. Plaintiffs' witness Eldridge, an employee of the Ford Company, who testified that he saw the train as it approached the crossing and the resulting accident, estimated the speed of the train to be 65 miles an hour as it approached the crossing, at which speed the stopping distance of the train, with brakes applied, according to the witness Simpson, would be 4192 feet. The stopping distance of the train, with brakes applied, at 60 miles an hour, would be 3586 feet, according to this same witness.

Plaintiffs offered additional testimony by their expert witness Simpson to the effect that if the train was going 60 miles an hour, which would be 88 feet per second, and the brakes were applied 7.2 seconds after the train reached the device for actuating the flashers and gates, the lead engine of the train would then be 2380 feet west of the crossing when the brakes were so applied, and the train would be going 40 miles an hour at the crossing. The witness Simpson also testified that if the brakes were applied 1185 feet west of the crossing, as stated by the engineer, and if the

train was then going 62.8 miles per hour, as calculated by this expert witness, the train would be going 55 miles an hour at the crossing. In any event, if the train was going 60 miles an hour, or 62.8 miles an hour, or 65 miles an hour, when the brakes were applied, as indicated by the testimony most favorable to the plaintiffs, the train would be going at a fairly rapid rate of speed at the crossing.

The flashing lights, bells and gates were installed pursuant to Sec. 22.768 of Michigan Statutes Annotated, Comp. Laws 1948, § 469.8, which provides in part as follows:

"Whenever flashing lights are installed at any crossing and the Michigan public utilities commission shall find it necessary, they shall be so arranged that for every train or switching movement over the crossing, the flashing lights shall be in operation for a period of not less than twenty [20] seconds nor more than sixty [60] seconds in advance of the train movement reaching the nearest established curb line of the highway and the flashing lights shall continue to operate until the train movement has passed the established curb line on the near side of the highway."

I interpret that statute to mean, as I indicated during the trial of the case, that there must be a warning of at least 20 seconds, by flasher lights at the crossing, before the train reaches the crossing, and that the lights are not permitted to be in operating condition, that is, flashing, for more than 60 seconds before the train reaches the crossing, in order to not unduly interfere with the movement of traffic upon the highway.

The flasher lights, bells and gates at this crossing were installed in 1950, pursuant to an order of the Michigan Public Service Commission, as I have already indicated. Subsequently the highway was widened from a 2-lane pavement to a 4-lane pavement in 1954, and the flasher lights and gates were moved to accommodate the change in the width of the highway.

In 1956 two additional spur tracks were installed at the crossing, making a total of 5 tracks which existed on the day of the accident, and the flasher lights and gates were again moved to permit that change of conditions.

In ordering the installation of the gates and flasher lights in 1950, the Michigan Public Service Commission authorized or ordered that the device for actuating the flasher lights and gates be installed 3018 feet west of the crossing. At that time the average speed of defendant's freight trains over the crossing, as I remember it, was about 50 miles an hour, and the speed of its passenger trains was about 80 miles an hour.

When Middlebelt Road was widened in 1954, and when the additional spur tracks were installed in 1956, and in 1961 at the time of the accident, it is my recollection that the average speed of the defendant's freight trains across this crossing was about 60 miles an hour, and that the average speed of the passenger trains was about 78 miles an hour, or at least somewhat less than 80 miles an hour.

The orders of the Michigan Public Service Commission in 1954 and 1956, when the road was widened and the two spur tracks were installed, expressly provided that except for such changes the terms and provisions of the original order of 1950 were in full force and effect.

It is the contention of the plaintiffs that conditions and circumstances at and near the crossing changed subsequent to 1950. The testimony indicated that the number of vehicles on Middlebelt Road at or near this crossing, in October 1950, for a 24-hour period, was 7056 vehicles. In July 1961, possibly a month or less after the accident, the traffic count at this same point had increased to 27493 vehicles for a 24-hour period. The testimony also showed that the United States census for 1950 indicated the population of the City of Livonia as being 17,534; and the 1960 census indicated the population of the city to be 66,702.

The testimony also indicates that the City of Livonia is 6 miles square, which would be 36 square miles.

The plaintiffs argue that the considerable increase in traffic on the highway and the considerable increase in population in the city are circumstances which are, in and of themselves, sufficient to take the issue of speed as a ground of negligence to the jury.

I think I am correct when I say that these circumstances of increased traffic and increased population are the only substantial circumstances upon which the plaintiffs rely to constitute a jury question as to the speed of the train at the time of the accident. There appear to be no other special circumstances of the nature set forth in the Morgan case. The crossing had the maximum protection; the tracks were straight for several miles in each direction from the crossing; the highway and the tracks were level; there was no obstruction to the view of a southbound motorist of trains approaching from either direction. Furthermore, there is a lack of any evidence as to the concentration of population at or near this crossing. As a matter of fact, the record indicates that the area for a distance of approximately a mile in each direction, according to plaintiffs' witness Thorne, was open except for the race track, the Kroger warehouse, the Ford plant, and a few other scattered buildings mentioned in his testimony. As to the factor of population, I have computed that in an area as large as the City of Livonia, which is 36 square miles, a total population, if evenly distributed, would be an average of 1863 per square mile. This is not a heavy concentration of population. As a matter of fact, the testimony would indicate that the population in the area of the crossing was certainly not heavy.

The court holds that the circumstances relied on by plaintiffs, namely, the factors of increased traffic and increased population subsequent to 1950 are not sufficient to constitute a jury question as to whether the speed of the train at the time of the accident was negligence.

I will now discuss the issue of whether there was any substantial evidence of failure of the engine crew to maintain a proper lookout, and, if so, whether such failure was a proximate cause of the accident. Again, I must consider the evidence and all inferences which may reasonably be drawn therefrom in the light most favorable to the plaintiffs. It now seems very clear, and shortly after this case was tried the court concluded, that the lookout issue, under the evidence, should not have been submitted to the jury. As a matter of fact, plaintiffs, in support of their claim in this respect, rely almost entirely on some of the evidence of the witness Eldridge who testified on direct examination that the speed of the train did not change before the impact, and that the brakes were being applied on the train about two or three seconds after the impact. On cross-examination this witness admitted he was in error in stating that the speed of the train did not change prior to the impact, or at least that his observations in that respect were not proper, as indicated by the following testimony given by this witness on cross-examination:

"Q You feel that your estimate is accurate, within one mile an hour?

"A No, I don't think so.

"Q Well, that is what I am asking you sir, that as you were watching this train approach the crossing, isn't it conceivable that this train's speed could have been reduced some?

"A Possibly.

"Q And you not have been able to appreciate the difference with the naked eye?

"A I could not.

"Q You couldn't fairly say one way or the other, then, as far as your observations are concerned?

"A I could not."

Then, on redirect examination, covering the same matter, the witness Eldridge testified:

"Q I believe you also said you couldn't tell a slight variation one way or another. Do you think you could have observed whether there was a large variation in speed as you watched the train approach?

"A A large variation, no.

"Q You could not have told whether there was a large variation in speed while you were watching the train?

"A You mean variation in speed?

"Q Extreme increase in speed greatly, or decrease in speed greatly, while you were watching it; do you think you could tell that?

"A I couldn't, no.

"Q You couldn't?

"A No."

■ It is the contention of defendant that under the evidence in this case, viewed in the light most favorable to the plaintiffs, that any failure on the part of the crew to maintain a proper lookout could not have been a proximate cause of the accident which occurred. It is settled law in Michigan, and the general rule seems to be, that unless a proper lookout would have enabled the train crew to have avoided the accident, an improper lookout upon the part of the crew is not a proximate cause of the accident. See Buchthal v. N.Y.C. R.R. Co., 334 Mich. 556, 55 N.W.2d 92; also see the case of Markar v. N.Y., etc., R.R. a 2nd Circuit case reported in 77 F.2d 282, 283.

In other words, if the accident would have happened without defendant's negligent act, then such act was not the cause of the accident. See Lekas & Drivas, Inc. v. Goulandris, a 2nd Circuit case, reported in 306 F.2d 426, at page 430, citing 2 Harper and James, The Law of Torts, Sec. 20.2, at page 1114; and The American Law Institute of Torts, Sec. 432, comment "B" and illustrations 1 and 2.

Plaintiffs argue that the train crew's alleged improper lookout substantially contributed to the accident, and consequently was a proximate cause of the accident, and cite Prosser on Torts, 2nd edition, at page 252, in support of their position.

■ The court has examined this authority, and notes, as Dean Prosser points out, on pages 220 and 221 of his work, that the substantial contribution theory only applies if two causes concur to bring about an event, and either one of them operating alone would have been sufficient to cause a similar result. This is not the instant case, since the alleged improper lookout of the train crew standing alone, without the negligence of Mrs. Zatek, would not have caused the accident and ensuing injury and death. In other words, any improper lookout by the train crew, under the evidence in this case, viewed in the light most favorable to the plaintiffs, was not a substantial factor in causing the accident and the accompanying death and injury.

In this connection it should be pointed out that the jury, by its verdicts, found that Mrs. Zatek was guilty of negligence, which barred recovery in her wrongful death case.

The next step from this holding is to decide whether or not her negligence was the sole proximate cause of the accident. The cases relied on by plaintiffs on this issue are clearly distinguishable from the instant case. Ommen v. G.T. R.R. Co., 204 Mich. 392, 169 N.W. 914, did not involve any issue of proximate cause, but only the duty of the railroad as to ringing its bell near the crossing, its duty concerning what speed it could travel over the crossing, and the plaintiff's contributory negligence.

The case of Day v. Pere Marquette R.R. Co., 252 Mich. 589, 233 N.W. 425, involved the precise question of plaintiff's contributory negligence. The court in its opinion indicated that a flagman's action in that he warned the public of a freight train which had just passed, and then walked off to the side of the

road to talk to another person, and consequently failed to warn the public of the oncoming passenger train which hit plaintiff, presented questions of fact for the jury.

In Block v. Ann Arbor R.R. Co., 202 Mich. 341, 168 N.W. 526, there was evidence that the train did not slacken its speed until it had practically hit the plaintiff's wagon, and that the train hit the wagon just forward of the hub of the rear wheel. In other words, if the train was going slower, or if the brakes had been applied sooner, plaintiff could have avoided the accident.

In Marcott v. Marq., H. & O. R. Co., 47 Mich. 1, 10 N.W. 53, it appeared that a neighbor could have saved the child who was killed if he had reached him just a little earlier, or if the train had reached the point of injury perhaps two or three seconds later. The same is also true in Huff v. Michigan United Traction Co., 186 Mich. 88, 152 N.W. 936, where it appeared that a slight reduction in the speed would have prevented the accident and would have given the plaintiff a chance to pass across the tracks.

In the case of Hoover v. Detroit, Grand Haven and Milwaukee Railroad, 188 Mich. 313, 154 N.W. 94, the court held that where the testimony showed the train could not have been stopped to avoid the accident after the children appeared on the track, it was not error to direct a verdict for the defendant.

In the instant case there is no testimony to indicate that Mrs. Zatek would have been able to start her car should additional time have elapsed before the train reached the crossing. There is no evidence that she was making any effort to get out of the car. As a matter of fact, the testimony all indicated, by witnesses testifying for both parties, that she was trying to get the car started. It should also be noted in this respect that Mrs. Zatek, as I recall the testimony, was a new driver. She had only a temporary driving permit, and her driver's license was received at her home after her death. This may have been a significant factor. In any event, if the speed of the train, under the circumstances here, was not a question for the jury, on the issue of negligence, then the issue of failing to maintain a proper lookout as constituting negligence would be of no consequence, because if the speed of the train, under the circumstances, was not a triable issue for the jury to decide, then the negligence of Mrs. Zatek was clearly the sole proximate cause of the accident.

Reverting briefly to the speed issue, this court directs attention to three decisions: the case of Markar v. New York, etc. R.R., a 2nd Circuit case, reported in 77 F.2d 282, 283; the case of Engberg v. G.N. Ry. Co., 207 Minn. 194, 290 N.W. 579, which case was the subject of the annotation in 154 A.L.R. 206; and the case of Conner v. Penn. R.R., an Eastern District of Pennsylvania case, reported in 163 F.Supp. 718. These cases all held that where a crossing is guarded by automatic signalling devices, and these devices were properly operating at the time of the accident, it was not negligence as a matter of law for a railroad to run its trains at speeds of 50 or 60 miles an hour over such guarded crossing. The opinion of the 2nd Circuit in the Markar case is almost identical in all material aspects with the instant case. In that case the accident happened at a crossing guarded by automatic signalling devices, located on a much traveled highway, in a Connecticut town. The evidence also disclosed that the signalling devices were installed pursuant to orders of the Connecticut Public Service Commission, that the speed of the train was 60 miles an hour, and that there was no restrictive order against such speed by any state or municipal authority. The Markar case is the closest case on the facts to the instant case that counsel have cited or that the court has been able to find by independent research.

Other cases cited by plaintiffs in support of these issues are and can be distinguished. I shall not take the time to do it, but I refer specifically to the

Morgan case, 234 Mich. 497, 208 N.W. 434; Vernick v. Detroit, etc., R.R., 224 Mich. 321, 194 N.W. 992; Tobias v. M.C. R.R. Co., 103 Mich. 330, 61 N.W. 514; Coston v. Ann Arbor Ry. Co., 201 Mich. 232, 167 N.W. 940; Guggenheim v. Lake Shore Railroad, 66 Mich. 150, 33 N.W. 161; and Ommen v. G. T. W. R.R., 204 Mich. 392, 169 N.W. 914.

Furthermore, the two cases cited by plaintiffs in their supplemental brief filed recently, with respect to the issues of lookout and proximate cause, are of no particular consequence, especially when considered in the light of the facts of this case. Neither case was a railroad case, and the facts were so different that they are of no consequence to the decision of the issues here involved.

Before concluding I desire to comment briefly on the case of Perch v. N.Y.C. R.R. Co., 294 Mich. 227, 293 N.W. 778, upon which the defendant relies so heavily. This court feels that that case turns on the issue of proximate cause, and not on the question of the duty of a railroad regarding the speed of its train at a protected crossing. In that case the vehicle of plaintiff's decedent had come to a stop in front of the crossing when another vehicle hit the car of the plaintiff's decedent in the back and pushed it onto the track, and it was then struck by defendant's train which was admittedly proceeding at a speed in violation of a local ordinance, killing the plaintiff's decedent. The court, on rehearing, in a 5-to-3 opinion, held that the defendant's negligence in speeding was not a proximate cause of the accident, and that the sole proximate cause was the negligence of the other car in pushing the car of the plaintiff's decedent onto the track.

In the instant case, however, the same principle of proximate cause applies, since the train, as a matter of law, was not operating at a negligent speed under all the circumstances, as this court concludes, and also because the accident would have occurred regardless of the lookout maintained by the engine crew. In other words, the sole proximate cause of the instant accident was the negligence of Mrs. Zatek. And for a case involving these principles, and holding to that effect, see Pitcairn v. Brandes, a 6th Circuit case, reported in 87 F.2d 928, in which this court was involved as a practicing attorney.

There is one other thing I should say before closing, with respect to the lookout issue. As I have already indicated, the only testimony relied on by the plaintiffs in support of that claim is the testimony of the witness Eldridge, who did give testimony to the effect that the train did not slow down before the accident, and that the brakes were applied after the accident; he said "two or three seconds after the accident." It is inconceivable to this court that any witness, standing at a distance from the railroad, could testify to the application of the brakes on the train. This witness stated nothing from which such a conclusion could be drawn, except that he noticed sparks under the train at the crossing, and he testified that the train did not slow down before the impact, but later admitted both on cross-examination and on redirect examination that even if the train had slowed down he would not have noticed it. In effect, that was what he said. From that testimony—having stopped 2632 feet beyond the crossing, that therefore the brakes were applied within that distance; and from that, based on testimony of the expert witness Simpson, they argue, from the stopping distance of the train within approximately that distance, the speed of the train would have been approximately 50 miles an hour; and had the train been proceeding at that speed, when the engineer should have seen Mrs. Zatek on the track, the train could have been either stopped or substantially stopped before the accident. This involved a complete repudiation of the testimony of the witness Eldridge as to his estimate of the speed of the train as being 65 miles an hour at the crossing. In any event, as I have previously stated, even though the evidence should justify an inference that the train crew did not

maintain a proper lookout, and that such failure could have been a proximate cause of the accident, still in view of the holding of this court that the evidence of the speed of the train, viewed in the light most favorable to the plaintiff, and taking into consideration the condition of traffic and population, as I have already discussed, the lookout issue would be of no consequence, since the negligence of Mrs. Zatek in that event would necessarily have been the sole proximate cause of the accident.

I have probably overlooked some matters in dictating this decision from the bench. If so, it has not been intentional. I have spent a great deal of time on these motions. My conclusions are the best that I can do.

Therefore, the motions to set aside verdicts and enter judgments in favor of the defendant, in all five cases, are granted.

Appropriate orders and judgments may be submitted.